Chief Judge Desmond.
On an agreed statement of facts there was submitted to the Appellate Division this controversy: Is plaintiff telephone company entitled to reimbursement from defendant city for the expense of relocating in another street the company’s telephone lines and other facilities which had lain in a public street, the relocation having been made necessary by the city’s closing part of the street and using the discontinued street section as part of the site for a “ middle income housing project” which site after assemblage thereof by the city was conveyed by the city to a limited dividend corporation to develop it as a housing project financed pursuant to the National Housing Act? The Appellate Division, answering in the affirmative, considered that the determinative issue before it was “ whether the renewal project, undertaken by the city and thereafter conveyed to the private interest, constitutes a governmental function or a proprietary one.” Citing two principal authorities (Matter of City of New York [Gillen Place], 304 N. Y. 215, and City of New York v. New York Tel. Co., 278 N. Y. 9) the court concluded that in acquiring land to be transferred to a private corporation the city acted solely in a proprietary capacity. On that same theory the City of New York was held, in the two cited cases, so to have acted when it closed streets for a bus garage and for a subway entrance. In those two instances, as here, held the Appellate Division, the purpose of the street closing was for a public purpose and in the public *159 interest but was proprietary in tlie sense that the activity requiring the street closing' was a business activity of the sort carried on by private entrepreneurs.
Plaintiff telephone company argues that what it calls its " contract " with the City of Binghamton gives it a property right to be compensated for the destruction of its rights in the street unless the destruction necessarily results from the performance by the city of a governmental function. The city replies that under New Yorli law (see General Municipal Law, arts. XV, XV-A, XV-B, and particularly the policy statement of § 501) and by the decisions of this court (Matter of Murray v. La Guardia, 291 N. Y. 320; Kaskel v. Impellitteri, 306 N. Y. 73 and Cannata v. City of New York, 11 N Y 2d 210, app. dsmd. 371 U. S. 4) the razing of substandard buildings is the performance of a high and essential governmental function even though the deared land is ultimately to be turned over to private developers.
The distinction between ‘ ‘ governmental function ’ ’ and ‘ ‘ proprietary function” is a sort of abstraction difficult to make meaningful in a day when municipalities continually find new ways to exercise police power in their efforts to cope with the pressing needs Of their citizens. Actually, to decide this case it is not necessary to uphold or reject Matter of City of New York (Gillen Plaoe) (304 N. Y. 215, supra) or City of New York v. New York Tel. Co. (278 N. Y. 9, supra). For present purposes those decisions can be limited to their own facts and to their special holding, that is, that when the city chooses to operate what are commonly called “ public utility ” businesses the city’s operation thereof has no Such priority over privately owned utility companies as to subject the latter to compulsory removal of their facilities without compensation in aid of the municipal operation. So analyzed, those cases are not controlling here. Bather-, the present submission requires us to determine whether or not this particular enforced removal of the telephone company’s property from this particular street was or was not subject to the unquestioned common-law rule against compensation for such expenses. The common-law rule, based on public considerations of a high order, has never been doubted or questioned and any exceptions thereto should be carved, out with reluctance and from compelling considerations *160 of constitutional right. The common-law doctrine was most recently restated by this court in New Rochelle Water Co. v. State of New York (10 N Y 2d 287) where we reminded ourselves that “ The obligation of the State to pay the cost of relocation or the value of retired facilities did not exist at common law ” (p. 291). In the New Rochelle opinion we quoted with approval Judge Cbane’s statement in Transit Comm. v. Long Is. R. R. Co. (253 N. Y. 345, 351, 353) as follows: “ ‘ The “ fundamental common law right applicable to franchises in streets ” is that a utility company must relocate its facilities in the public streets when changes are required by public necessity * * *. “ Although authorized to lay its pipes in the public streets, the company takes the risk of their location and is bound to make such changes as the public convenience and security require, at its own cost and charge.” ’ ” Reasonable regulation and control by the municipality of its streets means, said the Transit Comm. opinion (p. 351), that the public service corporations “ are bound to relocate their structures at their own expense whenever the public health, safety or convenience requires the change to be made.” This opinion, written in 1930, characterized as a departure from the common-law rule the holdings that the cost of removal and relocation is not on the utility company “ when the change is required in behalf of other public service corporations or in behalf of municipalities exercising a proprietary instead of a governmental function” (p. 352). It would be stretching this departure or exception too far to apply it in cases like this where the city is not “ going into business ” for itself, as it does when it operates a bus line or subway system.
The city’s purpose in closing off this street is fully set forth in the statement of agreed facts. Before authorizing the general project the city “ undertook extensive studies ” of the existence of urban blight in the city including the area which became this project. Such studies included street pattern, flow of traffic, condition of buildings in the general area and social and economic effects thereof on the community. The resolution thereafter adopted by the city determined among other things that the project area was substandard and insanitary, a blighted area predominantly residential, a slum, deteriorated and deteriorating and characterized by declining property values, tax delinquency, low average rents, the existence of social problems, *161 high incidents of delinquency and crime and over-occupancy of dwelling units. It was stipulated that the closing of the street was in furtherance of an urban renewal project undertaken by the City of Binghamton under the General Municipal Law and pursuant to title 1 of the National Housing Act of 1949 and in accordance with a resolution adopted by the City Council and approved by the Mayor pursuant to which the city acquired title to about 29 acres of land including all the properties along both sides of the street as well as the discontinued part of the street itself. The agreed facts include a statement that the city ‘ ‘ conveyed such properties to Chenango Court, Inc., a limited dividend corporation, for a consideration, and for development as a middle income housing project to be financed under Section 221 D-3 of the National Housing Act.” Back in 1943 in Matter of Murray v. La Guardia (291 N. Y. 320, supra) this court ruled that acquisition by the city of slum properties and retransferral to a private limited dividend housing corporation was an acquisition for a public use despite the intended and actual reconveyance to private interests. We made it entirely clear in Murray that this was no less a public purpose because the private corporation might ultimately reap profit (pp. 329-330). We carefully pointed out that clearing, replanning and rehabilitation of substandard and insanitary areas is. a public purpose separate in itself regardless of subsequent use of the property. We reaffirmed this in 1953 in Kaskel v. Impellitteri (306 N. Y. 73, supra) and in 1962 in Cannata v. City of New York (11 N Y 2d 210, supra) where we wrote (p. 215) that “ Taking of substandard real estate by a municipality for redevelopment by private corporations has long been recognized as a species of public use ” (citing cases) and that the condemnation by a city of a substandard area is a public use even when the area was to be turned into sites for needed industries. After all these holdings it is much too late now to decide that slum elimination is not a “ governmental function ” at all but a “ proprietary ” one.
We see no controlling importance to the fact that if plaintiff itself does not pay for this relocation cost it will become part of the total slum clearance cost of which the city pays a small fraction and the rest being made up by the Federal and State Governments. Nor do we see significance in the other fact that *162 the owners of other lands taken for the project will receive fall compensation. Those other owners had title to their lands whereas the telephone company had a mere privilege or permit to nse part of the street for a special purpose (see Transportation Corporations Law, § 27) which privilege was subject to the common-law rule imposing on the utility company the cost of relocation if public necessity should so require.
The order should be reversed and judgment directed for the defendant dismissing the claim, with costs in this court and in the Appellate Division.
Judges Fuld, Soileppi, Bergan and Keating- concur with Chief Judge Desmond; Judges Van Voorhis and Bukke dissent and vote to affirm both upon the ground that respondent’s franchise rights could not be eliminated by the street closing unrelated to any alterations or use as a highway and upon the further ground that it is for a proprietary purpose, all as held in Matter of City of New York (Gillen Place) (304 N. Y. 215) and cases cited therein.
Order reversed, etc.