[Civ. No. 17831. Fourth Dist., Div. Two. Dec. 15, 1977.]

PACIFIC TELEPHONE AND TELEGRAPH COMPANY,
Plaintiff and Appellant, v.
REDEVELOPMENT AGENCY OF THE CITY OF REDLANDS
et al., Defendants and Respondents.

**COUNSEL**

Donald R. King, Gerald H. Genard, Tony R. Skogen and Eugene Topel for Plaintiff and Appellant.

Welebir, Brunick & Taylor and Edward F. Taylor for Defendants and Respondents.

Eugene B. Jacobs, Robert P. Berkman, Mark D. Breakstone, John W. Witt, City Attorney (San Diego), William S. Shaffran, Deputy City Attorney, Daniel J. Curtin, Jr., City Attorney (Walnut Creek), P. Lawrence Klose, City Attorney (Petaluma), McDonough, Holland, Schwartz & Allen and Joseph E. Coomes, Jr., as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**TAMURA, J.**—The central issue on this appeal is whether a telephone company must bear the cost of relocating underground facilities it maintains in street rights-of-way where relocation is necessitated by

vacation of the streets in furtherance of a redevelopment project under the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.).

For reasons expressed below, we have concluded that the utility must relocate its facilities at its own expense.

The pertinent facts are not in dispute. In 1972 the City Council of the City of Redlands approved a redevelopment plan which included as one of its major elements the construction of a shopping mall in a blighted downtown area and called for the city's cooperation in the vacation of streets, alleys, and other public ways and the relocation of sewers, water mains, and other public facilities. The project required the vacation of two streets in which Pacific Telephone and Telegraph Company (PT&T) maintained underground long distance telephone cables pursuant to rights granted by Public Utilities Code section 7901.[1]

The city redevelopment agency notified PT&T of the proposed .vacation of the streets and the necessity of relocating the company's facilities to other city streets. PT&T responded it would relocate upon payment of its relocation costs. The city declined to so agree, undertook street vacation proceedings, and adopted a resolution vacating and abandoning the streets without reserving public utility easements therein.[2] PT&T relocated its facilities under protest, submitted a claim to the city for $72,088.64, and, upon rejection of the claim, commenced the instant action against the city and the city redevelopment agency to recover the relocation costs.

PT&T's complaint alleged the facts summarized above and sought recovery on two theories: (1) Inverse condemnation and (2) damages for requiring relocation without affording the utility prior notice and an opportunity to be heard. In their answer, the city and the agency admitted the factual allegations of the complaint but denied liability.

---

[1]Public Utilities Code section 7901 provides: "Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters."

[2]The city is empowered, in its discretion, to reserve and to except from the vacation of a street an easement to construct, maintain, and operate utility facilities pursuant to existing franchises. (Sts. & Hy. Code, § 8330.)

Each side moved for a judgment on the pleadings. The court initially granted PT&T's motion but, on a motion for reconsideration, granted defendants' motion and entered judgment that PT&T take nothing by its complaint. PT&T appeals.

PT&T concedes the common law rule to be that, in the absence of a provision to the contrary, a public utility's franchise rights in a public street are subject to an implied obligation to relocate its facilities at the utility's own expense when necessary to make way for a proper governmental use of the street. (*New Orleans Gaslight Co.* v. *Drainage Commission of New Orleans*, 197 U.S. 453, 461-462 [49 L.Ed. 831, 835, 25 S.Ct. 471, 473-474]; *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co.*, 51 Cal.2d 331, 334 [333 P.2d 1]; *Southern Cal. Gas Co.* v. *City of L.A.*, 50 Cal.2d 713, 716 [329 P.2d 289].) However, PT&T maintains: (1) The common law rule does not govern the instant relocation because (a) the Community Redevelopment Law contemplates reimbursement of relocation expenses incurred by a utility, and (b) apart from the Community Redevelopment Law, a municipality must compensate a utility for relocating its facilities to accommodate an urban redevelopment project when the plan contemplates ultimate development of the property to industrial or commercial uses; and (2) assuming applicability of the common law rule, the utility was nevertheless entitled to damages in the amount of the relocation expenses, because it was not afforded notice and an opportunity to be heard on the necessity for relocating its facilities. In the ensuing discussion, we examine those contentions seriatim and conclude that they are without merit.

I

The utility's primary contention is that the case at bench is not governed by the common law rule because relocation was occasioned by a redevelopment project under the Community Redevelopment Law. The argument rests on Health and Safety Code sections 33390, 33391, and 33395.[3]

Section 33390 defines the term "real property" as including "[e]very estate, interest, privilege, easement, franchise, and right in land"; section 33391 empowers a redevelopment agency to "[a]cquire real property by eminent domain"; and section 33395 provides that "[p]roperty already

---

[3]Unless otherwise indicated, all section references in this opinion are to the Health and Safety Code.

devoted to a public use may be acquired by the agency through eminent domain." PT&T's argument takes the following form: The right granted to a telephone company by Public Utilities Code section 7901 constitutes a franchise and hence is a species of "real property" as that term is defined in section 33390; PT&T's right to maintain its facilities in the streets in question is "[p]roperty already devoted to a public use" within the meaning of section 33395; the only method by which a redevelopment agency may acquire "[p]roperty already devoted to a public use" is by eminent domain; relocation costs incurred by PT&T were, therefore, recoverable in an inverse condemnation action. We are unpersuaded.

■ While the right granted to a telephone company by Public Utilities Code section 7901 has often been termed a "franchise" (*Pac. Tel. & Tel. Co.* v. *City & County of S.F.,* 51 Cal.2d 766, 770-771 [336 P.2d 514]; *Pac. Tel. & Tel. Co.* v. *City of Los Angeles,* 44 Cal.2d 272, 276 [282 P.2d 36]; *Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106, 119 [116 P. 557]), it is not a grant of a proprietary interest in the street (*County of L.A.* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378, 387 [196 P.2d 773]; *Pacific Tel. & Tel. Co.* v. *City & County of San Francisco,* 197 Cal.App.2d 133, 154 [17 Cal.Rptr. 687]). The utility acquires only a limited right to use the streets to the extent necessary to furnish communication services to the public (*County of L.A.* v. *Southern Cal. Tel. Co., supra,* 32 Cal.2d 378, 387; *Pacific Tel. & Tel. Co.* v. *City & County of San Francisco, supra,* 197 Cal.App.2d 133, 154), and the franchise is subject to an implied obligation to relocate the facilities when necessary to make way for a proper governmental use of the streets (*Pacific Tel. & Tel. Co.* v. *City & County of San Francisco, supra,* 197 Cal.App.2d 133, 154; see *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co., supra,* 51 Cal.2d 331, 334; *Southern Cal. Gas Co.* v. *City of L.A., supra,* 50 Cal.2d 713, 716.)

■ In light of the nature of the utility's franchise or privilege, sections 33391 and 33395 cannot be construed to mean that relocation may be required only through exercise of the power of eminent domain or that compensation must be paid as though compelled by the federal and state Constitutions. Section 33391 is merely a provision empowering a redevelopment agency to exercise the power of eminent domain without which the power could not be exercised. (*City of Beaumont* v. *Beaumont Irr. Dist.,* 63 Cal.2d 291, 293 [46 Cal.Rptr. 465, 405 P.2d 377]; *County of Marin* v. *Superior Court,* 53 Cal.2d 633, 636 [2 Cal.Rptr. 758, 349 P.2d 526]; *People* v. *Superior Court,* 10 Cal.2d 288, 295-296 [73 P.2d

1221]; *San Bernardino County Flood etc. Dist.* v. *Superior Court,* 269 Cal.App.2d 514, 518 [75 Cal.Rptr. 24].) The same is true of section 33395 authorizing the agency to acquire by eminent domain property already devoted to a public use. **(4)** In granting a public agency the power of eminent domain, the Legislature may prescribe the kinds of property that may be taken as well as the purpose for which property may be condemned. (*Eden Memorial Park Assn.* v. *Superior Court,* 189 Cal.App.2d 421, 425 [11 Cal.Rptr. 189].) Conferral of the power of eminent domain, however, does not mean the power must be invoked or compensation must be paid where the agency's action does not result in a constitutionally compensable taking or damaging of property. ■ The city's insistence that the utility do that which it impliedly agreed to do when it accepted the franchise offer contained in Public Utilities Code section 7901 did not result in a taking or damaging of the utility's franchise rights. The city's action did not impose on the utility a burden it had not already assumed when it accepted the franchise by constructing its facilities in public streets. (*L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co., supra,* 51 Cal.2d 331, 336.) Thus, the required relocation cannot form the basis for an action in inverse condemnation. In order to state a cause of action for inverse condemnation, there must be an invasion or appropriation of some valuable property right possessed by the claimant. (*Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111].)

Although the Legislature may grant a utility the right to compensation for relocating its facilities to accommodate a proper governmental use of the street, such right should not be deemed to have been given unless the Legislature specifically so provides. (*Southern Cal. Gas. Co.* v. *City of L.A., supra,* 50 Cal.2d 713, 719; *First Nat. Bank of Boston* v. *Maine Turnpike Auth.,* 153 Me. 131, 152 [136 A.2d 699, 711]; *Consolidated Edison of New York* v. *Lindsay,* 24 N.Y.2d 309 [300 N.Y.S.2d 321, 248 N.E.2d 150, 154]; *Appalachian Power Co.* v. *City of Huntington,* —W.Va.— [210 S.E.2d 471, 475].) The sections of the Community Redevelopment Law on which PT&T bases its claim do not, either singly or collectively, manifest a legislative will that a utility be compensated for relocating facilities maintained in a public street pursuant to Public Utilities Code section 7901.

PT&T's contention is similar to another utility's unsuccessful argument in *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co., supra,* 51 Cal.2d 331. There, the Southern California Edison Co. based its

entitlement to relocation costs on an amendment to the Los Angeles County Flood Control Act which provided that " 'nothing in this act contained shall be deemed to authorize said district in exercising any of its powers to take, damage or destroy any property or to require the removal, relocation, alteration or destruction of any bridge, railroad, wire line, pipeline, facility or other structure unless just compensation therefor be first made, in the manner and to the extent required by the Constitution of the United States and the Constitution of California.' (Stats. 1953, ch. 1139, p. 2635, § 1.)" (*Id.*, at p. 336.) The utility argued that the quoted provision meant that compensation must be made in the same manner and to the same extent as if a constitutionally compensable taking or damaging of property had occurred. (*Id.*, at pp. 336-337.) In rejecting the contention, our high court interpreted the statute as providing for compensation only as required by the state and federal Constitutions. (*Id.*, at p. 337.) The court reasoned that had the Legislature intended to go beyond constitutional demands, it would have so provided as it had done elsewhere. (*Id.*) The court cited as an example the Marin County Flood Control and Water Conservation District Act which provides that the district shall " '*in addition to the damage for the taking, injury, or destruction of property,* also pay the cost of removal, reconstruction or relocation of any structure, railways, mains, pipes, conduits, wires, cable, poles, of any public utility which is required to be moved to a new location. . . .' (Stats. 1953, ch. 666, p. 1915, 1919; . . .)" (*Id.*, italics added.) In the case at bench, neither the Community Redevelopment Law nor Public Utilities Code section 7901 contains any express direction to compensate a utility for relocation expenses.[4] The broad definition of "real property" in section 33390 does not constitute an express legislative directive to reimburse utilities for relocation of their facilities. (See *Consolidated Edison Co. of New York* v. *Lindsay, supra,* 24 N.Y.2d 309 [248 N.E.2d 150, 154].)

We recognize that our analysis of the pertinent provisions of the Community Redevelopment Law is at variance with the view expressed in *East Bay Muni. Utility Dist.* v. *Richmond Redevelopment Agency,* 51 Cal.App.3d 789 [124 Cal.Rptr. 606]. There, after a brief recitation of the

---

[4]When the Legislature intends that a utility be reimbursed for its relocation costs, it has said so in specific and direct language. For example, in addition to the instance cited by the Supreme Court in *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co., supra,* 51 Cal.2d 331, 337, the Legislature has expressly provided for reimbursement of relocation costs of utility facilities maintained in freeways (Sts. & Hy. Code, §§ 702, 703), relocations required by the Southern California Rapid Transit District (Pub. Util. Code, § 30631), and relocations required by the Reclamation Board in connection with certain flood control projects (Wat. Code, § 8617.5).

substance of sections 33390, 33391 and 33395, the Court of Appeal concluded: "The apparent purpose of Health and Safety Code sections 33390, 33391 and 33395 is to protect franchise holders, including utilities, from uncompensated seizures of property occasioned by redevelopment projects. (See *Vermont Gas Systems, Inc.* v. *City of Burlington* (1971) 130 Vt. 75, 82 [286 A.2d 275, 279]; *City of Center Line* v. *Michigan Bell Tel. Co.* (1970) 26 Mich.App. 659 [182 N.W.2d 769], affd. 387 Mich. 260 [196 N.W.2d 144]; *Mayor etc. of Baltimore* v. *Baltimore Gas & Elec. Co.* (1959) 221 Md. 94 [156 A.2d 447]; *In re Gillen Place, Borough of Brooklyn, etc.* (1952) 304 N.Y. 215 [106 N.E.2d 897]; *City of Columbus* v. *Indiana Bell Telephone Co.* (1972) 152 Ind.App. 22 [281 N.E.2d 510].)

". . . . . . . . . . . . . . . . . . .

"Therefore, if the relocating costs had been incurred as a result of an exercise of governmental power by the redevelopment agency (through an eminent domain proceeding or by a taking established as compensable in an inverse condemnation action) EBMUD would have been entitled to recover. . . ." (*East Bay Muni. Utility Dist.* v. *Richmond Redevelopment Agency, supra,* 51 Cal.App.3d 789, 794.)

We would first observe that the *East Bay* court nevertheless affirmed the judgment denying recovery from the redevelopment agency for the utility district's cost of relocating its water mains. (*Id.,* at p. 795.) The reviewing court held that the trial court's implied finding that relocation was not occasioned by the exercise of the agency's power of eminent domain was supported by the record in that it appeared the utility had intended to replace its existing water main with a larger line, its engineers had planned the relocation, the redevelopment agency was never apprised of the cost of relocation, there was no resistance to the planned relocation and a claim for compensation was never filed. (*Id.,* at pp. 794-795.) Thus, the quoted language is dictum.

In any event while we have the highest regard for the author of the *East Bay* opinion, for reasons heretofore stated, we respectfully decline to share the view expressed in the court's dictum.

Nor are we persuaded by the cases from other jurisdictions cited by the *East Bay* court. In the cited cases, relocation costs were held to be compensable either because of the particular language of the state statute or redevelopment ordinance or on the theory that it was somehow unfair to require the utility to bear relocation costs where the urban renewal or

redevelopment project contemplated ultimate development by private individuals for commercial or industrial purposes. Among the cited cases, PT&T relies most heavily upon *City of Center Line* v. *Michigan Bell Tel. Co.*, 26 Mich.App. 659 [182 N.W.2d 769], affd. 387 Mich. 260 [196 N.W.2d 144]. There, the Michigan Court of Appeal held that the utility should recover relocation expenses because (1) otherwise the ultimate private developers would benefit at the expense of another private corporation (the utility) and (2) since urban renewal is "a socially-oriented program operating under the guise of the police power," the relocation costs should be borne by the taxpayers rather than the consumers of the utility service. (*City of Center Line* v. *Michigan Bell Tel. Co.*, *supra*, 26 Mich.App. 659 [182 N.W.2d 769, 770-771].) The Michigan Supreme Court was unimpressed with the first reason given by the Court of Appeal, but held that the second reason, though as expressed was "unfelicitous," was sound and in accord with the legislative will. (*In re City of Center Line*, 387 Mich. 260 [196 N.W.2d 144, 146].) The statutory analysis, however, merely consisted of the following cryptic conclusions: "The whole tenor of the act is for the city to acquire private interests through purchase. The inclusion in the definition of real property in Sec. 2(e) of 'every estate, interest, *privilege, easement*' and the direction to the city to acquire such real property in Sec. 5 obviates the constitutional question of whether it is necessary to reimburse a utility for relocation costs when a public use entails the removal and relocation of equipment. [¶] We hold that the RBA [Rehabilitation of Blighted Areas] act requires that the city reimburse a utility for costs for removal and relocation of its equipment necessitated by the implementation of an urban renewal plan under the act." (*In re City of Center Line*, *supra*, 387 Mich. 260 [196 N.W.2d 144, 146-147].) As we have explained, we do not so analyze the California Community Redevelopment Law.

Other out-of-state cases which we believe to be better reasoned have held that a utility must bear the expense of a utility relocation necessitated by an urban renewal or redevelopment project. (*Southern Union Gas Co.* v. *City of Artesia*, 81 N.M. 654 [472 P.2d 368, 369-370]; *Consolidated Edison of New York* v. *Lindsay*, *supra*, 24 N.Y.2d 309 [248 N.E.2d 150, 153-154]; *New York Telephone Co.* v. *City of Binghamton*, 18 N.Y.2d 152 [272 N.Y.S.2d 359, 219 N.E.2d 184, 188]; *Bristol Tennessee Housing Auth.* v. *Bristol Gas. Corp.*, 219 Tenn. 194 [407 S.W.2d 681, 682-683]; *Appalachian Power Co.* v. *City of Huntington*, *supra*, 210 S.E.2d 471, 475.)

We hold that the California Community Redevelopment Law does not require the city or agency to compensate PT&T for the expense of relocating its facilities to other city streets. We perceive nothing fundamentally unfair in requiring the utility to bear the relocation expenses as a part of its cost of doing business. It is for the Legislature to decide whether those expenses should be shifted to the taxpayers. It has not so decided in the Community Redevelopment Law.

PT&T maintains, however, that apart from the Community Redevelopment Law it is entitled to recover relocation expenses because the city and the agency were acting in a proprietary capacity. This contention must also be rejected.

The labels "governmental function" and "proprietary function" are of dubious value in terms of legal analysis in any context. The classification has been employed primarily in the tort field as a judicial technique for determining questions of common law governmental immunity. The distinction was, as Professor Van Alstyne observes, manifestly unsatisfactory: "It offered no solid grounds for prediction, invited test litigation, operated in a fortuitous and erratic fashion, and had little relevance to either the social need for risk distribution or the economic feasibility of shifting from the injured individual to the public treasury losses due to serious injuries. The eradication of the distinction from the governmental immunity doctrine was attributed in *Muskopf* to the fact that it operated both 'illogically' and 'inequitably.' *Muskopf v. Corning Hosp. Dist.* (1961) 55 C2d 211, 216, 11 CR 89, 92." (Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) § 1.17, p. 19.)

The classification is not a serviceable tool for decision making in the present context. "The distinction between 'governmental function' and 'proprietary function' is a sort of abstraction difficult to make meaningful in a day when municipalities continually find new ways to exercise police power in their efforts to cope with the pressing needs of their citizens." (*New York Telephone Co.* v. *City of Binghamton, supra,* 18 N.Y.2d 152 [219 N.E.2d 184, 186].) A utility's right to compensation should depend, not on whether municipal activity is "governmental" or "proprietary," but on whether compensation has been required by the Legislature, or whether there has been a constitutionally compensable taking or damaging of a valuable property right.

PT&T urges that *City of Los Angeles* v. *Los Angeles Gas & Electric Corp.,* 251 U.S. 32 [64 L.Ed. 121, 40 S.Ct. 76], and *Postal Tel.-Cable Co.*

v. *San Francisco*, 53 Cal.App. 188 [199 P. 1108], compel us to apply the distinction in determining its right to compensation. Even were we to feel so compelled, those cases do not aid PT&T's cause. They are readily distinguishable under traditional governmental and proprietary function concepts. They involved utility relocations required to accommodate a public utility business carried on by a municipality. Under traditional tests, such enterprises were uniformly treated as being proprietary in nature. (Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) § 1.17, p. 18.)

▪ However, in this day and age it is too late to quarrel with the proposition that elimination of urban blight by acquiring and clearing areas so infected and converting them into sites for commercial and industrial development is a legitimate governmental function. (*New York Telephone Co.* v. *City of Binghamton, supra,* 18 N.Y.2d 152 [219 N.E.2d 184, 187]; *Bristol Tennessee Housing Auth.* v. *Bristol Gas Corp., supra,* 407 S.W.2d 681, 683.) To hold otherwise would be viewing "present day conditions under the myopic eyes of years now gone." (*Redevelopment Agency* v. *Hayes,* 122 Cal.App.2d 777, 803 [266 P.2d 105].) In *New York Telephone Co.* v. *City of Binghamton, supra,* the New York Court of Appeal held that it need not endorse or reject the "governmental-proprietary" distinction drawn in *In re Gillen Place, Borough of Brooklyn, etc.,* 304 N.Y. 215 [106 N.E.2d 897], cited in the *East Bay* court's dictum and relied upon by PT&T, because "clearing, replanning and rehabilitation of substandard and insanitary areas is a public purpose separate in itself regardless of subsequent use of the property." (*New York Telephone Co.* v. *City of Binghamton, supra,* 18 N.Y.2d 152 [219 N.E.2d 184, 186-187].) We agree.

In this state, the Community Redevelopment Law contains the following legislative policy declaration: "(c) That the redevelopment of blighted areas and the provisions for appropriate continuing land use and construction policies in them constitute public uses and purposes for which public money may be advanced or expended and private property acquired, and *are governmental functions of state concern* in the interest of health, safety, and welfare of the people of the State and of the communities in which the areas exist." (§ 33037, subd. (c), italics added.) ▪ While such legislative declarations are not binding on the courts, as statements of policy they are "entitled to great weight and it is not the duty or prerogative of the courts to interfere with such legislative finding unless it clearly appears to be erroneous and without reasonable

foundation " (*The Housing Authority* v. *Dockweiler,* 14 Cal.2d 437, 449-450 [94 P.2d 794]; accord *Fellom* v. *Redevelopment Agency,* 157 Cal.App.2d 243, 248 [320 P.2d 884].) Our courts have respected the legislative policy declaration. Municipal acquisition of blighted areas for redevelopment under the Community Redevelopment Law has consistently been held to be a proper function of government. (*In re Redevelopment Plan For Bunker Hill,* 61 Cal.2d 21, 41, 71 [37 Cal.Rptr. 74, 389 P.2d 538]; *Redevelopment Agency* v. *Hayes, supra,* 122 Cal.App.2d 777, 800-802.) Vacation of public streets in furtherance of a redevelopment project is expressly authorized by section 33220 and is likewise an exercise of a governmental function.

 PT&T's contention that it is entitled to compensation on the theory that the city and the agency were acting in a proprietary capacity is without merit.

## II

 The utility's due process argument merits little consideration. PT&T urges that even if this court should conclude that relocation did not involve a "taking" or "damaging" of the utility's property, it was nevertheless denied procedural due process because it was not afforded notice and an opportunity to be heard before being required to relocate. The only authority cited is *Leppo* v. *City of Petaluma,* 20 Cal.App.3d 711 [97 Cal.Rptr. 840]. *Leppo* is inapposite. That was an action for damages for the demolition of a building as a public nuisance. (*Id.,* at p. 715.) The reviewing court held that absent an emergency, a municipality must give the owner notice and an opportunity to be heard before it may order demolition of a building as a public nuisance. (*Id.,* at pp. 718-719.) As we have explained, in the case at bench there has been no taking or damaging of the utility's property.

Furthermore, PT&T had ample opportunity to be heard both on the scope and nature of the redevelopment plan as well as on the city's intention to vacate the streets in question. PT&T did not allege that the city or the agency failed to comply with the notice and hearing requirements of the Community Redevelopment Law (§§ 33348, 33349, 33355, 33356, 33360-33363) or the provisions of the Streets and Highways Code pertaining to vacation of city streets (Sts. & Hy. Code, §§ 8322-8323). Nor does it contend it could amend its complaint to so

allege. In the absence of such allegation, it must be presumed that the city and agency proceeded in the manner required by law.

The judgment is affirmed.

Gardner, P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied January 5, 1978, and appellant's petition for a hearing by the Supreme Court was denied February 23, 1978.