[Civ. No. 41715. First Dist., Div. Two. May 23, 1979.]

EAST BAY MUNICIPAL UTILITY DISTRICT,
Plaintiff and Respondent, v.
RICHMOND REDEVELOPMENT AGENCY et al.,
Defendants and Appellants.

**COUNSEL**

Samuel V. McGrath, City Attorney, Eugene B. Baird and Malcolm Hunter, Assistant City Attorneys, for Defendants and Appellants.

John B. Reilley and Frank E. Howard for Plaintiff and Respondent.

**OPINION**

**KANE, Acting P. J.**—The appeal at bench concerns the question whether a publicly held utility company must bear the relocating cost of its underground facilities where the relocation is necessitated by vacation of streets in furtherance of a redevelopment project under the California Community Redevelopment Law (Health & Saf. Code,[1] § 33000 et seq.).

The parties to this appeal are appellants Richmond Redevelopment Agency (Agency) and City of Richmond (City) and respondent East Bay

---

[1]Unless otherwise indicated, all references will be made to the Health and Safety Code of California.

Municipal Utility District, a public corporation (EBMUD). The pertinent facts indicate that prior to June 1973, the City entered into a local grant-in-aid and cooperation agreement (Cooperation Agreement) with the Agency and adopted an urban renewal plan for a project known as "Downtown Richmond Redevelopment Project No. 10-A" (hereafter Project 10-A). Project 10-A was undertaken by the Agency pursuant to the California Community Redevelopment Law, and its purpose was to eliminate slums and blighted areas in the City. Under the Cooperation Agreement the City, among other things, agreed to vacate such streets, roads, alleys and other public ways as required for the implementation of the renewal plan and Project 10-A.

Contemporaneously, the Agency executed a loan and capital grant contract (Grant Contract) with the United States Department of Housing and Urban Development (HUD) to secure federal funding for Project 10-A. Although under HUD regulations the relocation expenses of publicly owned utilities are eligible for a federal grant, the Agency failed to include in the Grant Contract the relocation cost of EBMUD facilities, and failed to claim federal assistance for said purpose in any other way.

By virtue of its statutory franchise, EBMUD had installed and was operating and maintaining its pipelines and other facilities within the following portions of streets within the project area: (a) 13th Street between Barrett and Nevin Avenues; (b) 12th Street between Barrett and Nevin Avenues; (c) 13th Street between Macdonald and Bissell Avenues; and (d) 12th Street between Macdonald and Bissell Avenues. For the purpose of carrying out the renewal plan and in accordance with the Cooperation Agreement, the City commenced proceedings to vacate the described portions of 12th and 13th Streets. Although EBMUD objected to the vacations and requested that the City reserve EBMUD easements in those streets for its water mains and other facilities, the orders of vacation did not reserve easements or any other rights to EBMUD. The proposed use of the vacated portions of 12th and 13th Streets physically required the relocation of EBMUD's facilities from those areas. As a result, a dispute arose between the parties as to who was responsible for the cost of relocation. In order to avoid delaying or otherwise impeding the progress of the project, EBMUD entered into a status quo agreement with the City and the Agency. Under the agreement EBMUD consented to the relocation of its facilities from the disputed area and the City and the Agency undertook to deposit the sum of $69,196 in escrow with the

understanding that said amount would be disbursed as directed by the final judgment of the court.

EBMUD accomplished the relocation of its facilities by cutting them off, removing them from service, and installing new lines in other streets to achieve equivalent hydraulic capacity for the whole general area. The relocation expenses incurred by EBMUD amounted to $56,435.

After the relocation of facilities was completed, EBMUD brought a declaratory relief action against the City and the Agency in order to determine the rights and duties of the parties. Following a trial without a jury, the lower court held that the cost of relocation of water lines and appurtenances which was necessitated by the implementation of Project 10-A could not be imposed upon EBMUD. In accordance therewith, the trial court concluded that EBMUD was entitled to a judgment against the appellants in the sum of $56,435.47 plus interest. The present appeal is taken from the latter judgment.[2]

■ In disposing of the seminal issue raised on appeal, i.e., who is to be charged with the relocation cost of water facilities occasioned by the implementation of Project 10-A, initially we note that the statutory right granted to EBMUD to construct, operate and maintain certain facilities in and along public streets and ways (Pub. Util. Code, §§ 10101, 12808) is not a vested property right, but merely a franchise (*State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 703 [111 P.2d 651]; *Pacific Tel. & Tel. Co.* v. *City & County of San Francisco* (1961) 197 Cal.App.2d 133, 147 [17 Cal.Rptr. 687]). ■ It is well settled that in absence of specific legislation to the contrary, a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for proper governmental use of the streets (*New Orleans Gaslight Co.* v. *Drainage Comm.* (1905) 197 U.S. 453, 461-462 [49 L.Ed. 831, 835, 25 S.Ct. 471]; *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co.* (1958) 51 Cal.2d 331, 334 [333 P.2d 1]; *Southern Cal. Gas Co.* v. *City of L.A.* (1958) 50 Cal.2d 713, 716 [329 P.2d 289]; *East Bay Municipal Utility Dist.* v. *County of Contra Costa* (1962) 200 Cal.App.2d 477, 480 [19 Cal.Rptr. 506]).

[2]Although appellants were also ordered to pay the additional sum of $7,000 plus interest for the value of the reserved easement in 7th Street, the appeal at hand is limited only to that portion of the judgment which pertains to the award of relocation costs incurred with respect to 12th and 13th Streets.

■ While conceding that its right to the water utilities was but a statutory franchise or easement, EBMUD nevertheless maintains that the case at bench is not governed by the aforestated common law rule. Its primary contention is that the relocation in dispute took place under the California Community Redevelopment Law (§§ 33390, 33391, and 33395) and that this enactment constitutes specific legislation which carves out an exception to the common law implied obligation and renders the Agency liable for the relocation cost of water utilities (*East Bay Muni. Utility Dist.* v. *Richmond Redevelopment Agency* (1975) 51 Cal.App.3d 789 [124 Cal.Rptr. 606]; see also *Vermont Gas Systems, Inc.* v. *City of Burlington* (1971) 130 Vt. 75 [286 A.2d 275]; *City of Center Line* v. *Michigan Bell Tel. Co.* (1970) 26 Mich.App. 659 [182 N.W.2d 769] (affd. 387 Mich. 260 [196 N.W.2d 144]); *City of Columbus* v. *Indiana Bell Telephone Co.* (1972) 152 Ind.App. 22 [281 N.E.2d 510]; *Arkansas Louisiana Gas Co.* v. *City of Little Rock* (1974) 256 Ark. 112 [506 S.W.2d 555]). Respondent's position is not well taken.

Although the Legislature may grant a utility the right to compensation for relocating its facilities to accommodate a proper governmental use of the street, such right will not be deemed to have been given unless the Legislature specifically so provides (*Southern Cal. Gas Co.* v. *City of L. A., supra,* 50 Cal.2d 713, 719; *First Nat. Bank of Boston* v. *Maine Turnpike Auth.* (1957) 153 Me. 131 [136 A.2d 699, 711]; *Consolidated Edison Co. of N. Y.* v. *Lindsay* (1969) 24 N.Y.2d 309 [300 N.Y.S.2d 321, 327, 248 N.E.2d 150]). An analytical interpretation of sections 33390, 33391 and 33395 reveals that they, at best, set up a framework by which redevelopment agencies are authorized to exercise the power of eminent domain. At the same time, however, they fail to provide the requisite specific legislation with respect to the allocation of costs necessitated by the transfer of utility facilities from municipal streets.

This interpretation is demonstrated first by the language of the statutory sections themselves. Section 33390 defines the term " 'Real property' " as including "Every estate, interest, privilege, easement, franchise, and right in land . . ." (subd. (d)). Section 33391 empowers a redevelopment agency to "Acquire real property by eminent domain." (Subd. (b).) Lastly, section 33395 provides that "Property already devoted to a public use may be acquired by the agency through eminent domain. . . ." A simple reading of these sections thus discloses that while the Legislature authorized the redevelopment agencies to acquire a variety of real property, including franchises, by eminent domain, the

broad language of the cited sections was not intended to cover such specific matters as the allocation cost of displaced or transferred facilities.

The interpretation given to the cited statutory provisions is further supported by case law. Thus, in *Consolidated Edison Co. of N.Y.* v. *Lindsay, supra,* 300 N.Y.S.2d 321, a utility sought reimbursement for the cost of relocating its facilities from vacated streets in an urban renewal project area. Under the Administrative Code, owners of real property affected by the street closing were entitled to compensation. Consolidated Edison claimed that the definition of " 'real property' " which included " '*all surface and subsurface structures* within closed streets and all easements and hereditaments, corporeal or incorporeal, and every estate, interest and right, legal and equitable, in lands, and every right, interest, privilege, easement and *franchise* relating to the same' " (italics partially added) created an exception to the common law rule. The court rejected this argument, stating, "Contrary to Con Ed's contention, neither the definition of 'real property' . . . nor anything else in title E of the Administrative Code abrogates the common-law rule. *The burden and expense traditionally imposed on the public utility to remove and relocate its property may not be transferred to the taxpayer absent 'express direction of the Legislature.' [Citation.] A broad definition of real property does not amount to such 'express direction.' [Citation.]* As a matter of fact, when the Legislature intends that the utility company be reimbursed for the relocation of its properties, it has done so in language which is clear and to the point." (P. 327; italics added.)

The same type of statutory language was considered by the Supreme Court of Maine in *First Nat. Bank of Boston* v. *Maine Turnpike Auth., supra,* 136 A.2d 699. The statute authorized the turnpike authority to acquire by condemnation real property and interests in real property such as easements, franchises, etc. In holding that the broad language granting the turnpike authority the power to condemn did not show a clear legislative intent that the authority was required to pay the cost of utility relocation, the court underlined that "The enabling act does not in the very words state that the Authority may or must pay the relocation costs in dispute here. Nor does the act imply that those costs may or must be so paid. The description and enumeration of costs and properties fall short of containment of payments for expense arising from damages without the invasion of legal right. The rights of utilities to enjoy installations in public streets or ways are positive and very respectable in the status of the law but they are subordinate to public travel and to the valid exercise of

the police power. They have, as we have seen, supra, their delimitations. *The terms, 'real property' 'interest or interests therein,' 'lands,' 'rights,' 'easements' and 'franchises' as used in the enabling act prior to its last amendment are not sufficiently apt to support the claim of the defendant utilities.*" (P. 716, italics added.) See to the same effect *N. Y. City Tunnel Authority* v. *Consolidated Edison Co.* (1946) 295 N.Y. 467 [68 N.E.2d 445].)

Finally, and even more importantly, the very issue raised in the present case was presented for determination and was decided in a recent case, *Pacific Tel. & Tel. Co.* v. *Redevelopment Agency* (1977) 75 Cal.App.3d 957 [142 Cal.Rptr. 584] (hg. den.). Akin to the case at bench, in *Pacific Tel. & Tel. Co.* the City Council of the City of Redlands approved a redevelopment plan which included the construction of a shopping mall in a blighted downtown area and called for the city's cooperation in the vacation of streets, alleys and other public ways and the relocation of sewers, water mains and other public facilities. The project required the vacation of two streets in which Pacific Telephone maintained underground long distance telephone cables.

The city redevelopment agency notified Pacific Telephone of the proposed vacation of the streets and the necessity of relocating the company's facilities to other streets. Pacific Telephone was willing to relocate only upon the payment of relocation costs. The city turned down the request and adopted a resolution vacating and abandoning the streets without reserving public utility easements therein. Thereafter, the company relocated its facilities under protest, and claimed reimbursement from the city. When its claim was rejected, it commenced an action against both the city and the redevelopment agency to recoup the costs of relocation of its facilities occasioned by the redevelopment project.

In concluding that sections 33390, 33391 and 33395 of the California Community Redevelopment Law (the very sections relied on by respondent here) do not constitute specific legislation abrogating the common law implied obligation of the utility to pay the expenses of relocation of its street facilities and do not, either singly or in combination, manifest a legislative will that the utility be compensated for relocating its facilities in public streets, the court stated as follows: "*In light of the nature of the utility's franchise or privilege, sections 33391 and 33395 cannot be construed to mean* that relocation may be required only through exercise of the power of eminent domain or *that compensation must be paid as though*

*compelled by the federal and state Constitutions. Section 33391 is merely a provision empowering a redevelopment agency to exercise the power of eminent domain* without which the power could not be exercised. [Citations.] *The same is true of section 33395* authorizing the agency to acquire by eminent domain property already devoted to a public use. In granting a public agency the power of eminent domain, the Legislature may prescribe the kinds of property that may be taken as well as the purpose for which property may be condemned. [Citation.] *Conferral of the power of eminent domain, however, does not mean the power must be invoked or compensation must be paid where the agency's action does not result in a constitutionally compensable taking or damaging of property. . . . The city's action did not impose on the utility a burden it had not already assumed when it accepted the franchise* by constructing its facilities in public streets. [Citation.] Thus, the required relocation cannot form the basis for an action in inverse condemnation. . . ." (Pp. 963-964, italics added.)

By denying compensation to the utility on the broad provisions of the Community Redevelopment Law, the court pointed out in *Pacific Tel. & Tel. Co.* that when the Legislature intended that a utility be reimbursed for its relocation cost, it said so in specific and direct language. The court cited as an example the Marin County Flood Control and Water Conservation District Act, which specifically prescribed that the district shall " ' "*in addition to the damage for the taking, injury, or destruction of property,* also pay the cost of removal, reconstruction or relocation of any structure, railways, mains, pipes, conduits, wires, cable, poles, of any public utility which is required to be moved to a new location. . . ." (Stats. 1953, ch. 666, p. 1915, 1919; . . .)' " (*Id.,* at p. 965.) Similarly, the Legislature has expressly provided for reimbursement of relocation costs of utility facilities maintained in freeways (Sts. & Hy. Code, §§ 702, 703), relocations required by the Southern California Rapid Transit District (Pub. Util. Code, § 30631) and relocations required by the Reclamation Board in connection with certain flood control projects (Wat. Code, § 8617.5).

*East Bay Muni. Utility Dist.* v. *Richmond Redevelopment Agency, supra,* 51 Cal.App.3d 789, upon which respondent primarily relies, is not controlling in the case at bench for several reasons.[3] One, the language

---

[3]We must, in all fairness to the distinguished trial judge, point out that this case did appear to be "controlling." Only after the instant appeal was filed was the cited decision rejected in *Pacific Tel. & Tel. Co., supra,* 75 Cal.App.3d 957, and *City of San Pablo* v. *East Bay Mun. Utility Dist.* (1977) 75 Cal.App.3d 609 [142 Cal.Rptr. 256], *infra.*

quoted from that case (i.e., "The apparent purpose of Health and Safety Code sections 33390, 33391 and 33395 is to protect franchise holders, including utilities, from uncompensated seizures of property occasioned by redevelopment projects," *id.,* at p. 794) is merely dictum, and it has no governing effect here for that reason alone. Two, the court in *Richmond Redevelopment Agency* indicated that EBMUD would have been entitled to recover only if the relocating costs had been incurred as an exercise of governmental power by the redevelopment agency through an eminent domain proceeding or by a taking established as compensable in an inverse condemnation action. As appears from the facts set out earlier, in the instant case the streets in question were vacated by the City and also the relocation of EBMUD facilities took place upon the direct order of the City. In short, the "taking," if any, was done not by the redevelopment agency, but rather by the City. Three, *Richmond Redevelopment Agency* was predicated primarily on cases decided in other jurisdictions and embraced the legal rationale propounded by outside courts. In light of *Pacific Tel. & Tel. Co.,* which reanalyzed the issue and set out the underlying California legal policy in considerable detail, the policy considerations voiced in sister state cases have less than decisive weight.

■ Respondent next argues that the City has police power to vacate streets only when it is necessary to make way for a proper governmental use of streets and that the promotion or implementation of a redevelopment project does not constitute proper governmental use and/or sufficient public purpose justifying the exercise of the police power of the municipality. As a consequence, continues respondent, the common law obligation imposing the burden of relocating cost of facilities upon the utility company fails to materialize. Respondent's argument flies directly in the face of both the statute and the case law.

In declaring the state policy, the statute emphasizes *inter alia* that to protect and promote the sound development and redevelopment of blighted areas and the general welfare of the inhabitants of the communities in which they exist, "it is in the public interest to employ the power of eminent domain, to advance or expend public funds for these purposes, and to provide a means by which blighted areas may be redeveloped or rehabilitated" (§ 33037, subd. (b)), and "That *the redevelopment of blighted areas* and the provisions for appropriate continuing land use and construction policies in them *constitute public uses and purposes* for which public money may be advanced or expended

and private property acquired, *and are governmental functions of state concern in the interest of health, safety, and welfare of the people* of the State and of the communities in which the areas exist." (§ 33037, subd. (c); italics added.)

The case law likewise underlines that a city has a legitimate right to exercise its eminent domain power for public benefit and that the clearing, planning and rehabilitation of substandard areas is for the benefit of the public (*Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777 [266 P.2d 105]; *New York Telephone Co.* v. *City of Binghamton* (1966) 18 N.Y.2d 152 [272 N.Y.S.2d 359, 219 N.E.2d 184]). As the court put it in *Pacific Tel. & Tel. Co.* v. *Redevelopment Agency, supra,* 75 Cal.App.3d at p. 969, "However, in this day and age it is too late to quarrel with the proposition that elimination of urban blight by acquiring and clearing areas so infected and converting them into sites for commercial and industrial development is a legitimate governmental function. [Citations.] To hold otherwise would be viewing 'present day conditions under the myopic eyes of years now gone.' [Citation.]"

Paraphrasing the holding of another recent case, *City of San Pablo* v. *East Bay Mun. Utility Dist.* (1977) 75 Cal.App.3d 609, 615 [142 Cal.Rptr. 256], we conclude that since the Agency did not exercise its governmental powers under the Community Redevelopment Law to secure abandonment and relocation of EBMUD's water mains, it was not obligated to reimburse EBMUD for its relocation expenses. And since the City's vacation of public streets to enable the removal of urban blight and substandard conditions is obviously a proper exercise of its police powers, under well established law EBMUD was required to bear the relocation cost of its facilities.

Respondent's alternative contention that the judgment below is sustainable under the theory that EBMUD was a third party beneficiary under the Grant Contract entered into between the federal government and the Agency, requires but a relatively short discussion.

Civil Code, section 1559, provides that "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The American law which is followed by the California decisions classifies persons having enforceable rights under contracts to which they are not parties as either creditor beneficiaries or donee beneficiaries (*Southern Cal. Gas Co.* v. *ABC Construction Co.*

(1962) 204 Cal.App.2d 747, 752 [22 Cal.Rptr. 540]; Rest., Contracts, §§ 133, subds. (1), (2), 135, 136; 4 Corbin on Contracts (1951) § 774). Since EBMUD here was clearly not a donee beneficiary, it can recover under the grant contract only if it qualifies as a creditor beneficiary. Under well settled law, a person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee (*Martinez* v. *Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400 [113 Cal.Rptr. 585, 521 P.2d 841]; *Hartman Ranch Co.* v. *Associated Oil Co.* (1937) 10 Cal.2d 232, 244 [73 P.2d 1163]; Rest., Contracts, § 133, subd. (1)(b)).

To apply the above definition to the instant case, it means that EBMUD would be entitled to recover under the Grant Contract only if the federal government (the promisee to said contract) bore a legal duty toward EBMUD to pay compensation for the relocation of its water facilities. Respondent utterly failed to demonstrate that such duty existed on the part of the federal government. Quite to the contrary, section 707 of the terms and conditions, forming part II[4] of the Grant Contract, explicitly bars the claim of any third party against the government by providing that "*Nothing contained in this Contract shall create or justify any claim against the Government by any third person with whom the Local Public Agency may have contracted or may contract relative to* any land or any Local Grant-in-Aid or for the purchase of materials, supplies, or equipment or *the furnishing or performance of any work or services with respect to the Project* or any other projects." (Italics added.)

That portion of the judgment appealed from is reversed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied June 22, 1979, and respondent's petition for a hearing by the Supreme Court was denied August 28, 1979. Mosk, J., was of the opinion that the petition should be granted.

---

[4]We take judicial notice of part II of the Grant Contract, pursuant to Evidence Code, sections 452 and 459.