Chief Judge Fuld.
 

 These two proceedings arise out of the decision of. the City of New York, the appellant on these appeals, to condemn (1) an area of several blocks in lower Manhattan near the Brooklyn Bridge for urban renewal purposes and (2.) two blocks in the south Bronx for the purpose of building a public school on the site. In each proceeding, the Consolidated Edison Company (Con Ed) sought compensation for damages resulting from its being required to remove and relocate its pipes, mains, and conduits from the beds of the streets in the condemned areas. Since each case was initiated by a different type of proceeding, and the trial court reached a different conclusion in each, we treat the facts of each separately before dealing with the legal issues presented, which are virtually the same in both cases.
 

 Matter of Consolidated Edison Company
 
 v.
 
 Lindsay
 

 In April of 1964, the Board of Estimate approved the urban renewal plan for the acquisition of land in lower Manhattan, pursuant to title I of the Federal Housing Act of 1949 and article 15 of the General Municipal Law (§ 504). The project was known as the “Brooklyn Bridge Southwest Urban Renewal Plan ” (Resolution of Board of Estimate, April 9, 1964, Cal. No. 8-A, p. 1). The board also authorized condemnation proceedings, pursuant to “ Title B [General Condemnation Procedure] of Chapter 15 of the Administrative Code ”, for the acquisition “ of all the real property in the area necessary to be acquired for the urban renewal project, including the acquisition of the fee in public streets where not already owned by the City for street purposes ” (Resolution of Board of Estimate, April 9, 1964, Cal. No. 8-D, p. 1).
 

 The property was accordingly condemned by an order of the court, entered pursuant to title B of chapter 15 of the Administrative Code in November, 1964, vesting title in the city in fee to the streets to be closed. Since the city thus acquired title to the entire renewal area, it did not institute a “ street
 
 *315
 
 closing condemnation procedure ’ ’ pursuant to title E of chapter 15 of the Administrative Code, although the Board of Estimate did approve maps (filed some time later) showing the changes resulting from the street closings as required by that title (§§ E15-4.0, E15-4.1, E15-5.0).
 

 Under title B, the owners of condemned ‘1 real property ’ ’ — the definition of which does not include ‘ ‘ subsurface structures ” (§ B 15-1.0, subd. 6)
 
 [1]
 
 — are required to file claims for compensation. On the other hand, under title E it is the Corporation Counsel who applies, at the direction of the Board of Estimate, to the ¡Supreme Court for a determination of the compensation to be paid owners of “real property” affected or destroyed by a street closing (§ E15-4.0, subd. 4). “Real property” is in this instance defined (§ E15-1.0, subd. 5), in somewhat broader terms as including “
 
 all surface and subsurface structures
 
 within closed streets and all easements and hereditaments, corporeal or incorporeal, and every estate, interest and right, legal and equitable, in lands, and every right, interest, privilege, easement and franchise relating to the same ”.
 
 [2]
 

 Relying upon the common-law principle that utility companies are not entitled to compensation when a street closing requires the removal and relocation of their subsurface facilities, the city took no steps to recompense Con Ed for the expense of relocating its facilities. Con Ed therefore instituted the present article 78 proceeding to compel the city to proceed, under title E, to have its damages fixed. The court at Special. Term (Levey, J.) granted the petition and denied the city’s cross motion to dismiss the proceeding. It was Special Term’s view that the city’s acquisition of title under title B did not extinguish Con Ed’s franchise, that it was entitled to compensation and that
 
 Matter of City of New York (Gillen Place)
 
 (304 N. Y. 215) was decisive. The Appellate Division, agreeing with Spe
 
 *316
 
 cial Term, affirmed its judgment. Justice Timer dissented; it was Ms view that, since a slum elimination is a
 
 governmental
 
 function, as opposed to the
 
 proprietary
 
 function involved in
 
 Gillen Place,
 
 Con Ed was under the necessity of relocating its structures at its own cost.
 

 Matter of City of New York (Public School 161)
 

 As already indicated, this case differs from the preceding one in the manner in which it was instituted. After the Board of Education and the Site Selection Board had selected the site for the school and the Mayor had approved it, the Corporation Counsel commenced a title B condemnation proceeding. Following the order of condemnation — which included, in the description of the area taken, “ the bed of East 151st Street ”— the Board of Estimate approved maps, showing the discontinuance of that street, which were filed pursuant to title E of the Administrative Code (§ E15-5.0).
 

 Thereafter, the petitioner—in this case, the city—moved for an order directing Con Ed to remove its pipes, mains and conduits from the bed of East 151st Street, and the latter cross-moved for an order, in the nature of mandamus under article 78 of the CPLB, directing the city to institute a title E proceeding so that its damages could be determined.
 

 The court at Special Term (Markewich, J.) granted the city’s motion. It distinguished
 
 Gillen Place
 
 (304 N. Y. 215,
 
 supra)
 
 upon the ground that, whereas that case involved the ‘1 operation of a public utility business ”, the present one was concerned with a
 
 1 ‘
 
 proper governmental function ’ ’. A divided Appellate Division, the several justices expressing the same views as they had in the other case, reversed Special Term’s order.
 

 Firmly established is the common-law rule that utility companies, which have been granted the
 
 “
 
 privilege ” of laying their pipes and mains in the public streets —to quote from this court’s opinion in
 
 Transit Comm.
 
 v.
 
 Long Is. R. R. Co.
 
 (253 N. Y. 345, 351, 352) —must relocate them at their own expense ‘
 
 ‘
 
 whenever the public health, safety or convenience requires the change to be made ” and that departure from this settled principle is recognized
 
 only 1 ‘
 
 when the change is required in behalf of other public service corporations or in behalf of municipalities exercising a
 
 proprietary
 
 instead of a
 
 govern
 
 
 *317
 

 mental
 
 function. The departure from the rule arises out of the distinction between public welfare and private enterprise of a
 
 quasi
 
 public nature.” (Emphasis supplied; see, also,
 
 New York Tel. Co.
 
 v.
 
 City of Binghamton,
 
 18 N Y 2d 152,160;
 
 New Rochelle Water Co.
 
 v.
 
 State of New York,
 
 10 N Y 2d 287, 291;
 
 New York City Tunnel Auth.
 
 v.
 
 Consolidated Edison Co.,
 
 296 N. Y. 467, 474-475;
 
 Matter of City of New York [Fort Greene Houses],
 
 291 N. Y. 788, affg. 266 App. Div. 795, affg. 177 Misc. 101.)
 

 In two cases involving housing projects — one within New York City
 
 (Matter of City of New York [Fort Greene Houses],
 
 291 N. Y. 788, affg. 266 App. Div. 795, affg. 177 Misc. 101,
 
 supra)
 
 and the other outside of the city
 
 (New York Tel. Co.
 
 v.
 
 City of Binghamton,
 
 18 N Y 2d 152,
 
 supra)
 
 —we upheld and reaffirmed the common-law rule against reimbursing public utility companies for expenses incurred in removing and relocating their facilities. In the
 
 New York Tel. Co.
 
 case (18 NY 2d 152,
 
 supra),
 
 for instance, in discussing the subject, the court declared that
 
 “
 
 [t]he common-law rule, based on public considerations of a high order, has never been doubted or questioned and any exceptions thereto should be carved out with reluctance and from compelling considerations of constitutional right. The common-law doctrine was most recently restated by this court in
 
 New Rochelle Water Co.
 
 v.
 
 State of New York
 
 (10 N Y 2d 287) where we reminded ourselves that ‘ The obligation of the State to pay the cost of relocation or the value of retired facilities did not exist at common law ’ (p. 291.) * * * It would be stretching [the suggested] departure or exception too far to apply it in cases like this where the city is not ‘ going into business ’ for itself, as it does when it operates a bus line or subway system ’ ’ (pp. 159-160). These decisions point the conclusion on these appeals. In both of the cases before us, the city has condemned the area, in which Con Ed’s pipes are laid, for a
 
 “
 
 governmental ” and not a
 
 “
 
 proprietary ” function. The maintenance of schools has always been considered a public use and so, for many years, has urban renewal. As 'Chief Judge Desmond observed in the
 
 New York Tel. Co.
 
 case (18 N Y 2d, at p. 161): “ [T]he condemnation by a city of a substandard area is a public use even when the area was to be turned into sites for needed industries.. ■After all these holdings [to the same effect] it is much too late
 
 *318
 
 now to decide that slum elimination is not a
 
 ‘
 
 governmental function ’ at all but a ‘ proprietary ’ one. ’ ’
 

 It should be emphasized that the city is not attempting to
 
 appropriate
 
 Con Ed’s pipes and mains to its own use but is simply compelling the utility company to relocate them. Certainly, the city should not be required to recompense the company for the loss of a privilege which it obtained without paying the city a penny for its use.
 
 [3]
 
 Indeed, it may ultimately benefit materially from the compulsory removal. As the dissenter in the Appellate Division aptly observed,
 
 ‘1
 
 resurrecting a blighted portion of petitioner’s monopoly area of service enhances its future prospects and enables it to exercise unimpaired its full franchise rights in the urban renewal area.” Certainly the company has no vested property right to the use of any particular street but must assume the risk of having to relocate as part of its general right to use the streets. Our court’s quotation in the
 
 Transit Comm,
 
 case (253 N. Y. 345, 353,
 
 supra),
 
 from
 
 New Orleans Gas Co.
 
 v.
 
 Drainage Comm.
 
 (197 U. S. 453, 461) reflects the same thought: “ It would be unreasonable to suppose that in the grant to the gas company of the right to use the streets in the laying of its pipes it was ever intended to surrender or impair the public right to discharge the duty of conserving the public health. The gas company did not acquire any specific location in the streets; it was content with the general right to use them, and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the State might require for a necessary public use that changes in location be made.”
 

 Con Ed’s reliance on
 
 Gillen Place
 
 (304 N. Y. 215,
 
 supra)
 
 is misplaced. This court has made it abundantly clear in subsequent cases
 
 (New Rochelle Water Co.
 
 v.
 
 State of New York,
 
 10 N Y 2d 287,
 
 supra; New York Tel. Co.
 
 v.
 
 City of Binghamton,
 
 18 N Y 2d 152,
 
 supra)
 
 that the rule at common law was to be
 
 *319
 
 applied whenever property was condemned to permit the State or city to carry on a “ sovereign ” or
 
 “
 
 governmental ” function.
 
 (New Rochelle Water Co.
 
 v.
 
 State of New York,
 
 10 N Y 2d, at p. 292.) In both the
 
 New Rochelle Water Go.
 
 case and the
 
 New York Tel. Go.
 
 ease, the court noted that the
 
 Gillen Place
 
 decision was to be “ limited to [its] own facts and to [its] special holding ” (18 N Y 2d, at p. 159) and applied only in cases in which the acquisition of property was sought
 
 “
 
 to enable New York City to perform a
 
 proprietary
 
 function (10 N Y 2d, at p. 292).
 

 Contrary to Con Ed’s contention, neither the definition of “ real property ” (§ E15-1.0, subd. 5) nor anything else in title E of the Administrative Code abrogates the common-law rule. The burden and expense traditionally imposed on the public utility to remove and relocate its property may not be transferred to the taxpayer absent “ express direction of the Legislature.”
 
 (Transit Comm.
 
 v.
 
 Long Is. R. R. Co.,
 
 253 N. Y. 345, 355, supra.) A broad definition of real property does not amount to such “ express direction ”. (See, e.g.,
 
 New York City Tunnel Auth.
 
 v.
 
 Consolidated Edison Co.,
 
 295 N. Y. 467, 477,
 
 supra.)
 
 As a matter of fact, when the Legislature intends that the utility company be reimbursed for the relocation of its properties, it has done so in language which is clear and to the point. (See, e.g. Administrative Code, § D15-6.0, subd. b; Public Authorities Law, § 359, subd. 3.)
 

 In the
 
 Matter of Consolidated Edison Co.
 
 v.
 
 Lindsay,
 
 the order appealed from should be reversed and the petition dismissed, with costs in all courts.
 

 In the
 
 Matter of City of New York (Consolidated Edison Co.),
 
 the order appealed from should be reversed, with costs in this court and in the Appellate Division, and the determination of Special Term granting the petitioner-appellant’s motion and denying the respondent’s cross motion should be reinstated.
 

 Judges Burke, Scileppi, Bergan, Keating, Breitel and Jasen concur.
 

 In
 
 Matter of Consolidated Edison Go.
 
 v.
 
 Lindsay:
 

 Order reversed, with costs in all courts, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.
 

 
 *320
 
 In
 
 Matter of City of New York (Consolidated Edison Co.):
 

 Order reversed, with costs in this court and in the Appellate Division, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.
 

 [1]
 

 . Subdivision 6 of section B15-1.0 reads, in part, “‘ Real property ’: Includes all lands and improvements, lands under water, waterfront property * * * all easements and hereditaments, corporeal or incorporeal, and every estate, interest and right, legal or equitable, in lands or water, and right, interest, privilege, easement and franchise relating to the same ”.
 

 [2]
 

 . The applicable analogous provision of the General Municipal Law (§ 506) speaks only of the acquisition of “real property or any interest therein,” without further elucidation of the term.
 

 [3]
 

 . As the court wrote in the
 
 Transit Comm,
 
 ease (253 N. Y. 345, 351,
 
 supra), “
 
 The Gas Company has received from the public authorities its franchise or privilege to lay and maintain its gas main under the surface of the public street. Without this grant from the people it has no rights in the highway. This privilege, or franchise, is at all times subject to the police power of the State; in other words, the company maintains its pipes subject to the obligation to remove them whenever the public health or safety require this to be done.”