COUNTY OF NASSAU, Respondent, v SOUTH FARMINGDALE WATER DISTRICT, Appellant.

Second Department, May 22, 1978

*Carman, Callahan, Carman & Sabino (Gregory W. Carman* of counsel), for appellant.

*William Gitelman, County Attorney (Tracie P. Peddy, Robert S. Hoshino, Jr.,* and *Natale C. Tedone* of counsel), for respondent.

## OPINION OF THE COURT

SUOZZI, J.

We are called upon in this appeal to define the nature and scope of the right of the plaintiff county to order the removal of pre-existing water mains and pipes owned by the defendant, South Farmingdale Water District, and located under a State road, in order to make way for the construction of a county-wide sewer system. The Special Term and the dissent have adopted the view that the defendant municipal water district must bear the cost of removing those installations, which conflict with the county's construction of a sewer system.

For the reasons hereinafter set forth, I disagree with the conclusion reached by the Special Term and the dissent. In my view the county should bear the cost of removing and relocating the municipal water district's mains and pipes. Before expanding upon these reasons, I turn first to a statement of the facts and the procedural context of this appeal.

### THE FACTS AND STATUS OF THE LITIGATION

The defendant municipal water district is a special improvement district which was organized in 1931, pursuant to the Town Law, for the purpose of supplying water to the inhabitants of the district (see Town Law, §§ 190, 198, subd 3; § 215).

In accordance with proper enabling legislation, approximately 20 years ago the municipal water district constructed and installed certain water mains and pipes in the area of the Hicksville-Massapequa Road, continuing 500 feet south of the Seaford-Oyster Bay Expressway, and also in the area of Stewart Avenue, Old Post Road and Bayberry Lane.

In April, 1965 the County Board of Supervisors passed an ordinance creating a Sewage Disposal District and, subsequent thereto, drafted plans to install a sewer system in this area. It soon became apparent that the county's plans to install the sewer system would conflict with the water district's mains, valves and hydrants. Following numerous but unsuccessful meetings held between the county and the water district to resolve the conflict, the county demanded and directed that the defendant "relocate, temporarily remove and/or support and protect its water mains and other equipment", so as not to interfere with the county's sewer construction, and to do so at the water district's cost and expense. Upon the water

district's refusal, plaintiff's contractor removed the water installations at a cost to plaintiff of $22,074.52.

Plaintiff thereupon commenced this action for a declaration that the county's duty to build sewerage facilities was within the police powers of the State and was superior or "paramount" to the water district's right to maintain water utility installations, and for reimbursement from the defendant of the cost of relocating its mains. Defendant, in its answer, denied that plaintiff had a "paramount" right to construct a sewerage system and interposed numerous defenses, alleging, *inter alia:*

(1) that the route for the sewer lines was unreasonable and that defendant had neither been given timely notice nor consulted prior to the formulation of the sewer lines;

(2) that the defendant was a separate autonomous municipal corporation and was equal in stature to plaintiff with respect to this action;

(3) that plaintiff had actual knowledge long before construction commenced that its plans would cause substantial conflict with defendant's facilities; and

(4) that plaintiff's act constituted a "taking" of defendant's property without just compensation, and that the space sought by plaintiff "has already been put to a prior public use by installations of defendant."

As a counterclaim, defendant alleged, *inter alia,* that plaintiff had failed to supervise the contractor's work and that defendant had been compelled to relocate, replace and repair certain facilities, damaging it to the extent of $54,277.97. In the alternative, the water district alleged that by reason of the lack of notice to it, it did not have sufficient time to submit counterplans, which allegedly also resulted in damages in the amount of $54,277.97.

In its motion to dismiss the complaint, defendant argued that plaintiff's actions constituted a condemnation or taking of its property without compensation, a patently illegal act.

The Special Term, in denying the motion, relied on *Matter of Consolidated Edison Co. of N. Y. v Lindsay* (24 NY2d 309), which held that a privately owned utility must bear the cost of removing and relocating its lines whenever public health, safety or convenience so required. The Special Term also held that "no authority" existed to "warrant a different result" in the case of a public utility.

The dissent herein, in voting to affirm the order of Special Term, takes the view that the municipal water district, in supplying water to its residents, is carrying out a "proprietary" or nongovernmental function (see *Layer v City of Buffalo,* 274 NY 135, 136-139; *Canavan v City of Mechanicville,* 229 NY 473, 476; *Oakes Mfg. Co. v City of New York,* 206 NY 221, 228), and that in this capacity it is no different than a private utility and must therefore bear the risk and cost of removal of its installations if the public health, safety or welfare so require *(Matter of Consolidated Edison Co. of N. Y., v Lindsay,* 24 NY2d 309, 316-318, *supra).* The dissent also takes the position that the county's actions in directing that the municipal water district's installations be removed did not constitute an act of condemnation since the latter only acquired a license to install its equipment *(New York Tel. Co. v Town of North Hempstead,* 41 NY2d 691, 699-700).

There is no doubt that the county's actions did not constitute an act of condemnation since the right to install water lines is only a license or privilege and not the grant of an interest in or appurtenant to real property *(New York Tel. Co. v Town of North Hempstead, supra).* Accordingly, the municipal water district's arguments on this issue, which constitute the main thrust of its brief, must be rejected.

However, I do disagree with the distinction drawn by the dissent between proprietary and governmental functions of government in general, and with its description of a municipal corporation's supplying of water to its residents as a proprietary function of government in particular.

Although I am ready to concede that three New York cases cited by the dissent *(Oakes, Canavan* and *Layer, supra)* collectively support this distinction and its application to a municipal water supply system, I do not find those cases to be binding, or even persuasive, authority in resolving the issue at bar for the following reasons:

(1) the distinction between proprietary and governmental functions of government is a concededly artificial and illogical distinction which was judicially created in order to alleviate the hardships of the application of the doctrine of sovereign immunity in the field of torts; and

(2) the abolition of the doctrine of sovereign immunity and the reluctance of New York courts to expand that distinction in contexts other than in tort litigation, have rendered the

distinction a total anachronism, which has no rational connection, or any relevance, to the issue at bar.

As far back as 1865, the Court of Appeals stated that it was difficult to "appreciate the distinction suggested between the public and private functions" of a governmental body *(Darlington v City of New York,* 31 NY 164, 200). In subsequent cases New York courts defined governmental powers and functions as those which are "essentially public and for the general good of all the inhabitants" *(Sun Print. & Pub. Assn. v Mayor,* 8 App Div 230, 238, affd 152 NY 257, 265; see, also, *People ex rel. Buffalo & Fort Erie Public Bridge Auth. v Davis,* 277 NY 292, 298; 2 McQuillin, Municipal Corporations [1966 rev vol], § 10.05). Proprietary functions are those "relating to the accomplishment of private corporate purposes in which the public is only indirectly concerned, and as to which the municipal corporation is regarded as a legal individual" (2 McQuillin, Municipal Corporations [1966 rev vol], § 10.05, p 745). Under these definitions, it is readily understandable why one noted jurist remarked: "Indeed, since a governmental body exists solely for the purpose of benefiting its people and providing for the general good, it is quite difficult to understand how any public body that is not acting *ultra vires* can function in any other than a public manner" (MEDINA, J., in *Merritt-Chapman & Scott Corp. v Public Utility Dist. No. 2,* 319 F2d 94, 105).

Nevertheless, a "considerable body of law" arose which differentiated between the "governmental" and "proprietary" functions of public bodies in order to "mitigate the harsh rule that formerly prevailed holding governments immune from liability in tort" *(Merritt-Chapman & Scott Corp. v Public Utility Dist. No. 2,* 319 F2d 94, 105, *supra;* but, see, *Looper v City of Easley,* 172 SC 11; and *Turner v Travelers Ins. Co.,* 169 So 2d 736 [La], where the courts held that the municipality's supply of water was a governmental function, even in a tort context).

In New York, this approach was enunciated in three cases decided by the Court of Appeals in the early part of this century, i.e., *Oakes, Canavan* and *Layer.* It is to these three cases that I now turn.

In *Oakes Mfg. Co. v City of New York* (206 NY 221, 228, *supra),* which was decided in 1912, plaintiff, a manufacturer of dyes, alleged that the water it used from the city's supply contained a large percentage of chlorine which rendered it

unfit for plaintiff's manufacturing purposes. In holding that no cause of action in negligence had been made out, the court, in dicta, stated: "when * * * the city undertook to maintain a municipal water system and to supply water to private consumers at a fixed compensation, it was not acting in * * * [a governmental] capacity * * * It entered on an enterprise which involved the ordinary incidents of a business wherein was sold that which people desired to buy and which might become a source of profit".

*Canavan v City of Mechanicville* (229 NY 473, *supra),* which was decided in 1920, was a breach of warranty action in which damages were sought as the result of the consumption of impure water supplied by a municipality. The court noted that the action was unlike one to recover damages resulting from a city's failure to use its water to put out a fire, which would involve a governmental function. The court held that the city was not a guarantor of the purity of its water and that an action for breach of warranty would not lie. Before reaching that conclusion, the court, in dicta, stated (pp 476-477): "While the business of maintaining a municipal water system and supplying water to private consumers at fixed compensation is public in its nature and impressed with a public interest, it is not an exercise of governmental or police power. A municipal corporation in aggregating and supplying water for the extinguishment of fires discharges a government function. In operating a water works system, distributing water for a price to its inhabitants, it acts in its private or proprietary capacity, in which it is governed by the same rules that apply to a private corporation so acting * * * The conclusions of the text writers and the decisions of the courts, apart from those in this case, have been uniformly that a private water company or a municipality is not an insurer nor liable as a guarantor of the quality of the water it furnishes to its customers in the customary means of pipes and faucets, and cannot be held liable for injuries caused by impure water furnished by it unless it knew or ought to have known of the impurity; its duty is that of exercising reasonable and commensurate care and diligence in providing an adequate supply of wholesome water at all times."

Finally, in *Layer v City of Buffalo* (274 NY 135, *supra),* which was decided in 1937, plaintiff instituted an action in negligence to recover property damage for flooded cellars. The flooding was caused by the breaking of a water main owned

and maintained by the City of Buffalo. The court held that, on the evidence presented, a prima facie case of negligence had been made out by the plaintiff and that the trial court erred in granting the city's motion to dismiss at the close of the plaintiff's case. In so holding, the court, in a one-sentence paragraph, cited *Oakes (supra),* and stated (p 139): "There is no dispute that where a municipality is acting, as here, in a proprietary capacity, liability attaches for negligence, and the standard of care is the same as that exacted from the proprietor of a private buisness." It is interesting to note that the *Layer* case was decided eight years after the enactment of legislation which waived the State's immunity from tort liability (see Court of Claims Act, former § 12-a [L 1929, ch 467; § 1]; see, also, *Bloom v Jewish Bd. of Guardians,* 286 NY 349). In *Bernardine v City of New York* (294 NY 361), decided in 1945, the Court of Appeals flatly held that this waiver extended to the State and its political subdivisions, except public authorities (see, also, *Holmes v County of Erie,* 266 App Div 220, affd 291 NY 798; *McCarthy v City of Saratoga Springs,* 269 App Div 469, mot for lv to app den 269 App Div 912). Under these circumstances, it is quite understandable that a search of the authorities has revealed no other case in which the Court of Appeals has cited or relied on either *Canavan* or *Layer.*

Even during its heyday, the distinction between "governmental" and "proprietary" functions of government was subjected to a "veritable landslide" of criticism and was labeled an "enigma" and an "absurdity" (Note, 41 Miss LJ 477; Price and Smith, Municipal Tort Liability: A Continuing Enigma, 6 U Fla L Rev 330, 354; Fuller and Casner, Municipal Tort Liability in Operation, 54 Harv L Rev 437, 462).

The abandonment of the rule of sovereign immunity has virtually destroyed the only real basis for the creation of the distinction and also belies the dissent's argument that the elimination of the distinction will serve to preclude recovery in negligence for innocent parties previously protected.

Apart from the limited application of the governmental-proprietary function distinction in the past to the area of tort liability of governmental bodies and the present obsolescence of even that limited application of the distinction, it is significant to note that as early as the initial development of this distinction, the courts of this State, as well as the Supreme Court of the United States, recognized that decisions in the

field of tort liability were of little value and affirmatively refused to expand the distinction into other contexts.

In the *Oakes* and *Canavan* cases the Court of Appeals specifically noted that the supply of water by a municipal corporation to fight a fire was a governmental function. Here, the very pipes or mains that require relocation are used to supply water, not only for consumption, but also for the fighting of fires. Thus, it is readily apparent that the functions of the municipal utility with respect to the mains overlap and are merged; they cannot be readily separated or logically distinguished for the purposes of this action.

In *Brush v Commissioner* (300 US 352 [argued on Feb. 4, 1937 and decided on March 15, 1937—*Layer* was argued on March 19, 1937 and decided on April 27, 1937]), the Supreme Court was faced with the question whether an engineer in the New York City Department of Water Supply was exempt from Federal income taxes. The answer to that question was held to depend on "whether the water system of the city was created and is conducted in the exercise of the city's governmental functions. If so, its operations are immune from federal taxation" *(Brush v Commissioner, supra, p 360)*. The Supreme Court, in *Brush,* held that the municipal supply of water, for the purposes of that case, was a governmental function and that the engineer was exempt from taxation. The Supreme Court disregarded the governmental-proprietary distinction by stating (pp 362-365):

"There probably is no topic of the law in respect of which the decisions of the state courts are in greater conflict and confusion than that which deals with the differentiation between the governmental and corporate powers of municipal corporations. This condition of conflict and confusion is confined in the main to decisions relating to liability in tort for the negligence of officers and agents of the municipality. In that field, no definite rule can be extracted from the decisions. It is true that in most of the state courts, including those in the State of New York, it is held that the operation of water works falls within the category of corporate activities; and the city's liability is affirmed in tort actions arising from negligence in such operation. But the rule in respect of such cases, as we pointed out in *Trenton v. New Jersey,* 262 U.S. 182, 192, has been 'applied to escape difficulties, in order that injustice may not result from the recognition of technical defenses based upon the governmental character of such corporations';

and the rule is hopelessly indefinite, probably for that very reason.

"This is not, however, an action for personal injuries sounding in tort, but a proceeding which seeks in effect to determine whether immunity from federal taxation, in respect of the activity in question, attaches in favor of a state-created municipality—an objective so different in character from that sought in a tort action as to suggest caution in applying as the guide to a decision of the former a local rule of law judicially adopted in order to avoid supposed injustices which would otherwise result in the latter. * * *

"In the light of these considerations, it follows that the question here presented is not controlled by local law but is a question of national scope to be resolved in harmony with implied constitutional principles of general application. Compare *Workman v. New York City,* 179 U.S. 552, 557. This indicated dissimilarity constitutes a distinction which is fundamental; and we put aside the state decisions in tort actions as inapposite."

In *Wallerstein v Westchester Joint Water Works No. 1* (166 Misc 34, 36), decided over six months after the decision in the *Layer* case, a joint water works corporation formed by two towns and a village constructed a facility in a residential district in which that facility was not a specifically permissible use. Several property owners brought suit to enjoin construction of the facility. The court framed the issue as "whether the collection and distribution of water by * * * several municipal corporations may be denominated the exercise of a governmental function or the discharge of a corporate or private service." The court held that the municipal supply of water was a governmental function and that the facility was not subject to the provisions of the ordinance (see, also, *Village of Larchmont v Town of Mamaroneck,* 239 NY 551; *Nehrbas v Incorporated Vil. of Lloyd Harbor,* 2 NY2d 190, 193-194; *Merritt-Chapman & Scott Corp. v Public Utility Dist. No. 2,* 319 F2d 94, 106-108, *supra).*

In *Incorporated Vil. of Rockville Centre v State of New York* (48 Misc 2d 588), the State of New York acquired four parcels of land owned by the Village of Rockville Centre and used for water works and highways. The court ruled that the village was using the land for governmental purposes.

Ultimately, a governmental function can be defined as one which "was historically engaged in by local government * * *

is uniformly so furnished today * * * could not be performed as well by a private corporation * * * is not undertaken for profit or for revenue; and * * * is within the imperative public duties imposed on a municipality as agent of the State" (*Fahey v City of Jersey City,* 52 NJ 103, 108-109).

Applying these guidelines to the case at bar leads to the inevitable conclusion that the supplying of water by the municipal water district for consumption must be treated, in the context of this case, as a governmental, rather than a proprietary, function of a municipality.

The statements in the *Oakes, Canavan* and *Layer* cases that the supplying of water by a municipality is a proprietary function were, to a large extent, based on historic fact. Functions "that were ordinarily performed by private initiative * * * [were] apt to be treated in the cases as non-governmental when performed by the city itself" (Seasongood, Municipal Corporations: Objections to the Governmental or Proprietary Test, 22 Va L Rev 910, 914). Thus water was, for many years, supplied by private agencies. However, in this day and age, municipal water corporations have flourished to the relative exclusion of private utilities. Moreover, in our modern, complex urban civilization, it is readily apparent that the supplying of water by a municipality is as immediately and directly related to the health, safety and welfare of its inhabitants as is the construction of sewers which "are all but universally regarded as governmental" (Seasongood, Municipal Corporations: Objections to the Governmental or Proprietary Test, 22 Va L Rev, pp 914-916).

The Supreme Court of the United States was of the same view when it stated in *Brush v Commissioner* (300 US 352, 366, 368, 370-371, *supra):*

"The public interest in the conservation and distribution of water for a great variety of purposes—ranging from ordinary agricultural, domestic and sanitary uses, to the preservation of health and of life itself—is obvious and well settled. For the modern city, such conservation and distribution of water in sufficient quantity and in a state of purity is as vital as air. And this vital necessity becomes more and more apparent and pressing as cities increase in population and density of population. It has found, so far, its culminating point in the vast and supreme needs of the City of New York.

"One of the most striking illustrations of the public interest in the use of water and the governmental power to deal with

it is shown in legislation and judicial pronouncement with respect to the arid-land states of the far west. * * *

"While these cases do not decide, they plainly suggest, that municipal water works created and operated in order to supply the needs of a city and its inhabitants are public works and their operation essentially governmental in character. * * *

"We conclude that acquisition and distribution of a supply of water for the needs of the modern city involve the exercise of essential governmental functions, and this conclusion is fortified by a consideration of the public uses to which the water is put. Without such a supply, public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths, could not exist. And this is equivalent, in a very real sense, to saying that the city itself would then disappear. More than one-fourth of the water furnished by the city of New York, we are told by the record, is utilized for these public purposes. Certainly, the maintenance of public schools, a fire department, a system of sewers, parks and public buildings, to say nothing of other public facilities and uses, calls for the exercise of governmental functions. And so far as these are concerned, the water supply is a necessary auxiliary, and, therefore, partakes of their nature. *New York ex rel. Rogers v. Graves,* 299 U.S. 401, 406. Moreover, the health and comfort of the city's population of 7,000,000 souls, and in some degree their very existence, are dependent upon an adequate supply of pure and wholesome water. It may be, as it is suggested, that private corporations would be able and willing to undertake to provide a supply of water for all purposes; but if the State and City of New York be of opinion, as they evidently are, that the service should not be entrusted to private hands but should be rendered by the city itself as an appropriate means of discharging its duty to protect the health, safety and lives of its inhabitants, we do not doubt that it may do so in the exercise of its essential governmental functions.

"We find nothing that detracts from this view in the fact that in former times the business of furnishing water to urban communities, including New York, in fact was left largely, or even entirely, to private enterprise. The tendency for many years has been in the opposite direction, until now in nearly all the larger cities of the country the duty has been assumed

by the municipal authorities. Governmental functions are not to be regarded as non-existent because they are held in abeyance, or because they lie dormant, for a time. If they be by their nature governmental, they are none the less so because the use of them has had a recent beginning."

Indeed, it can be argued that governmental authorities considered the supplying of water to be of even greater importance than the construction of sewerage facilities, in view of the fact that the defendant municipal water district was created in 1931 to supply water as an alternative to wells and that the county has only recently assumed the responsibility of creating sewerage facilities in the very same areas, as an alternative to cesspools.

The fact that the defendant municipal corporation collects its revenues in the form of charges or fees for water, rather than by an *ad valorem* tax, should be of no legal significance and does not make it comparable to a private utility. In this municipal corporation, just as in the County of Nassau, there are no shareholders for whose benefit the service is provided as part of a profit-making enterprise and no dividends are paid out of revenues which exceed expenses. Just as the county relies upon its levy of an *ad valorem* tax for its revenues to operate the county, including the sewer district, so too the municipal corporation relies upon a levy in the form of fees in order to meet its operating expenses. The difference is one of form and not of substance.

Apart from the artificial, obsolete, and, in the context of this case, irrelevant characterization of a municipality's maintenance of a water system as a proprietary, rather than a governmental, function of government, there is no sound reason why the cost of removing these water mains and pipes, which are located over and under a State road, as opposed to a road owned by the county itself, should not be paid for by the body which has created the conflict and necessitated the relocation. Furthermore, it is inequitable to require that the cost of this relocation be shared by the taxpayers of the water district,who may be fewer in number than those in the district which will benefit from the sewer installation which necessitated the relocation. It is clearly more equitable to distribute the cost among the greater number.

It is not unreasonable to anticipate that by imposing this cost upon the county, it will be more circumspect in planning its facilities in a manner to minimize the cost and to avoid the

conflicts which resulted in this and similar litigation. For these reasons, I believe that the cost of relocation of the defendant's water mains and facilities should be borne by the county and not by the defendant.

GULOTTA, J. (dissenting). I dissent and vote to affirm.

The defendant is a special improvement district organized pursuant to the Town Law for the purpose of supplying water to the inhabitants of the district (see Town Law, §§ 190, 198, subd 3). Approximately 20 years ago, the district installed certain water mains and pipes in the area of Hicksville Road, south of the Seaford-Oyster Bay Expressway in Nassau County. This location coincides with an area in which the plaintiff county is presently constructing a section of its county-wide integral system of sewage disposal.

With this construction goal in mind, the county directed the defendant to remove and relocate certain of its equipment, at district expense, inasmuch as the installations conflicted with the route chosen for the county's sewer system. When the district refused to comply, the county had the installations removed at its own expense. In response to the district's refusal, the county, in February, 1977, commenced the instant action for (1) reimbursement to the county of the $22,074.52 cost of removing the district's equipment and (2) a declaration that the county's right to construct the sewerage system rests upon its obligation to protect the health and welfare of the county and, hence, is "paramount" to the district's duty to supply water to its residents. Accordingly, the complaint urges, the district was obligated to remove, replace and relocate any utility installations that conflicted with the county's "clear path", at the district's expense.

On or about July 8, 1977 the district moved to dismiss the complaint for failure to state a cause of action (see CPLR 3211, subd [a], par 7). Special Term denied the motion by order dated September 30, 1977. The district now appeals from that determination.

I believe that the complaint states a good cause of action and, hence, the order should be affirmed.

The district argues that in ordering the removal of the water utility installations at the district's expense, the county has "taken" or condemned the district's interest in property without just compensation in violation of the Fifth Amendment of the Constitution of the United States as well as

subdivision (a) of section 7 of article I of the Constitution of the State of New York. The argument fails to bear close scrutiny. It is a long-standing principle of common law that a *private* utility's right to lay pipes, mains and other installations in the public highway is a mere "license" or privilege conferred by the State, and that the utility must bear the risk and cost of removal of those installations should the public health, safety and welfare so require (see *Matter of Consolidated Edison Co. of N. Y. v Lindsay,* 24 NY2d 309, 316-318; *New York Tel. Co. v Town of North Hempstead,* 41 NY2d 691, 699-700; *New Rochelle Water Co. v State of New York,* 10 NY2d 287, 291; *Pennsylvania & So. Gas Co. v State of New York,* 57 AD2d 166, 167-168). The logic underlying this common-law rule is as follows: "the city is not attempting to *appropriate* * * * [the utility's] *pipes and mains* to its own use but is simply compelling the utility company to *relocate them.* Certainly, the city should not be required to recompense the company for the loss of a privilege which it obtained without paying the city a penny for its use * * * *Certainly the [utility] company has no vested property right to the use of any particular street* but must assume the risk of having to relocate as part of its general right to use the streets" *(Matter of Consolidated Edison Co. of N. Y. v Lindsay,* 24 NY2d 309, 318, *supra* [emphasis supplied]).

The situation respecting a municipal water district can be no different. All that defendant acquired was a mere license to install its water lines and equipment. It does not have an "interest" in the particular route or the location of its property under the public highways which is capable of being "taken". Stated differently, the county's action in directing the district to remove and relocate its installations does not amount to an act of condemnation (see *New York Tel. Co. v Town of North Hempstead,* 41 NY2d 691, 699-700, *supra;* 2 Nichols, Eminent Domain [3d ed], § 5.85, pp 5-440 to 5-441). The majority essentially agrees with this part of the analysis and, thus, rejects this branch of the district's argument.

This established, the pivotal issue raised on appeal (and perhaps it is one of first impression) is whether the water district, as a municipal corporation, enjoys greater rights to *compensation* for removal of its equipment than are bestowed upon private shareholder-owned utilities. The answer to this question, in turn, requires a determination of whether the

district, in supplying water to its residents, is engaged in a "proprietary" or a "governmental" activity.

When a municipal corportion acts in a "proprietary" capacity, it will be treated, for legal purposes, as its privately owned counterpart (see, e.g., *County of Herkimer v Village of Herkimer,* 251 App Div 126, affd 279 NY 560; 39 NY Jur, Municipal Corporations, § 185, p 293). Thus, should it ultimately be determined that the district is carrying out a proprietary function, we would be brought full circle back to the common-law rule of noncompensation under *Matter of Consolidated Edison (supra).* However, in *Nehrbas v Incorporated Vil. of Lloyd Harbor* (2 NY2d 190, 194), the Court of Appeals made the following observation with respect to this question: "Whether a particular activity involves a governmental function or one proprietary is a matter not always easy of determination. Past decisions, mostly in the field of tort liability (see, e.g., *Brush v. Commissioner,* 300 U. S. 352, 362; 18 McQuillin on Municipal Corporations [3d ed., 1950], p. 185 *et seq.),* prove of little value, and no all-embracing formula or definition is possible." The foregoing is particularly true today, for, as the Court of Appeals has recently noted in *Little Joseph Realty v Town of Babylon* (41 NY2d 738, 742), "the legal classification of a particular municipal activity as governmental or proprietary is, in this transitional age, subject to change with time and circumstance". I therefore recognize that the question of whether the water district is performing a governmental or proprietary function is not free from doubt.

The earlier precedents clearly indicate that "[i]n operating a water works system, distributing water for a price to its inhabitants, * * * [a municipal corporation] acts in its private or proprietary capacity" *(Canavan v City of Mechanicville,* 229 NY 473, 476; see, also, *Layer v City of Buffalo,* 274 NY 135, 139; *Oakes Mfg. Co. v City of New York,* 206 NY 221, 228). More recent cases cast an element of doubt upon this proposition (see, e.g., *Brush v Commissioner,* 300 US 352, 362-371; *City of Albany v State of New York,* 21 AD2d 224, affd 15 NY2d 1024; *Incorporated Vil. of Rockville Centre v State of New York,* 48 Misc 2d 588; *Matter of Barnathan v Kramer,* 44 Misc 2d 203, 208; *Wallerstein v Westchester Joint Water Works No. 1,* 166 Misc 34; see, also, 1962 Opns Atty Gen 121) and, by its decision today, the majority determines that the functions of a municipal water district are governmental

rather than proprietary in nature. From this premise, it is then further determined that, in exercising its governmental function, the county cannot enjoy "paramount" or superior rights to the district for reimbursement. An analysis of the majority's position reveals the following three bases therefor:

(1) water is equally essential to the welfare of the community as is sewage disposal; hence neither is more important than the other for the purposes of the county's police powers;

(2) the district's equipment carries water for *both* firefighting (a classic governmental function) and drinking (a traditional proprietary function) and that to designate two integrated operations as simply proprietary would create an artificial and illogical distinction; and

(3) "the abolition of the doctrine of sovereign immunity * * * [has] rendered the [proprietary-governmental] distinction a total anachronism".

Though the reasoning of the majority is not without force, there are cogent reasons for preserving the "proprietary" rule enunciated in the *Canavan* and *Layer* cases. The Law of Municipal Corporations, by Eugene McQuillin, which is generally considered to be an authoritative work in the field (see, e.g., *Orelli v Ambro,* 41 NY2d 952, 953; *Nehrbas v Incorporated Vil. of Lloyd Harbor,* 2 NY2d 190, 194-195, *supra),* is unequivocal in supporting *Canavan:* "a municipality, in the operation of a public utility, acts in its private and proprietary capacity rather than in a legislative or governmental capacity" (2 McQuillin, Municipal Corporations [1966 rev vol], § 4.156, p 243). And thereafter, specifically referring to a water utility, the author observes, "it is generally held that, insofar as a city undertakes to sell water for private consumption it is engaged in a commercial venture, as to which it functions as any other business corporation" (18 McQuillin, Municipal Corporations [3d ed rev], § 53.103, p 406). Finally, in a section devoted to the rights, duties and liabilities of a municipal corporation in the ownership of a public utility, the author reiterates, "[t]he general rule is that a municipality, in constructing or in operating its municipal plant, acts in a business, proprietary, or individual capacity rather than in a legislative or governmental capacity * * * The obligations resting upon it are identical to those of a private utility company *operating* under a municipal franchise * * * Although a municipality's operation of a public utility may be a proprietary activity, *such a municipality is engaged in a*

*public enterprise for a public purpose"* (12 McQuillin, Municipal Corporations [1970 rev vol], § 35.35, p 465 [emphasis supplied]). This last sentence emphasizes no more than it echoes what *Canavan* stated 58 years ago: "While the business of maintaining a municipal water system and supplying water * * * *is public in its nature and impressed with a public interest,* it is not an exercise of governmental or police power" *(Canavan v City of Mechanicville,* 229 NY 473, 476, *supra* [emphasis supplied]). Thus, the fact that the district is performing an operation which, in some sense, is "public in nature" should not conclusively determine the outcome of this case. Moreover, in seeking to abrogate the rule in *Layer* and *Canavan,* the majority would run counter to the rule prevailing in some 17 other jurisdictions, as well as in one Federal Circuit (see, e.g., *Coast Laundry v Lincoln City,* 9 Ore App 521; *City of Waco v Busby,* 396 SW2d 469 [Tex]; *Rollins v Department of Water & Power, City of Los Angeles,* 209 Cal App 2d 526; *Gordon v City of Medford,* 331 Mass 119; *Herlihy Mid-Continent Co. v Bay City,* 293 F2d 383; see, also, a list of other jurisdictions at 18 McQuillin, *op. cit,* § 53.103, n 3, p 408; Ann., 54 ALR3d 936, 940).

Finally, it should be noted that by affirming the order at Special Term we would not thereby be conclusively determining the outcome of this litigation, for should the district be able to prove its allegation that the county could just as easilty have located its sewer facilities adjacent to the district's equipment, without substantially greater cost or loss of efficiency and without disturbing the district's facilities, the district may well prevail.

DAMIANI, J. P., and O'CONNOR, J., concur with SUOZZI, J.; GULOTTA, J., dissents and votes to affirm the order, with an opinion.

Order of the Supreme Court, Nassau County, entered September 30, 1977, reversed, on the law, without costs or disbursments, and motion granted to the extent that the first cause of action is dismissed and, as to the second cause of action, it is declared that the cost of the relocation of defendant's water mains and facilities incurred by reason of plaintiff's construction of a sewer system should be borne by the plaintiff.