OPINION OF THE COURT
John R. LaCava, J.
This is an action brought by the plaintiff for damages incurred as a result of the supplying of rust-laden water to her household by the City of Yonkers on and between August 3, 1984 and August 20, 1984.
At a trial heard in Part V (small claims) of this court on September 9, 1985, the plaintiff testified that in July of 1984 her family noticed the appearance of rust in the household water supply. The situation worsened and on August 3, 1984 she sent a certified letter to the Commissioner of Public Works complaining about the "enormous amount of rust” in her water and the problems of discoloration which were being caused to her laundry, the bathroom fixtures, and possibly to her health.
After the letter was sent on August 3rd, the amount of rust increased. Mrs. Kusnir did not receive a reply to her letter and on August 8, 1984 she called the city’s Water Department and complained. The city flushed her hydrant on August 8th.
On August 9th Mrs. Kusnir again called City Hall and a representative, Mr. Thomas Tipper, came to her house and *26 took a sample of the water. Analysis revealed the turbidity (12 on a scale of 5) and the color (25 on a scale of 15) to be well above the normal MCL. Iron tested at 1.59 mg/1, more than five times the normal level of .3 mg/1.
On August 10th, testing of water from her kitchen faucet again showed that iron exceeded the normal level. The hydrant was again flushed. Mrs. Kusnir testified that when the hydrants were flushed the amount of rust decreased for a period of hours but always returned. The problem was most acute in the morning and would somewhat alleviate in the afternoon after the water in the two-family house had been running "all day”. Samples of the water were always taken in the afternoon (when the water was most clear) and the technician would let the water run "until it cleared up” before a sample was taken.
From August 12th through the 20th "Bad rust” appeared constantly in the water. Mrs. Kusnir called the city on August 13th through 16th and on August 20th. From time to time the city would come and flush the hydrants (e.g., no one came on the 11th and 12th, Saturday and Sunday, but the hydrants were flushed on the 13th through 16th and on the 20th).
On September 17, 1984 the plaintiff filed a notice of claim against the City of Yonkers for damages incurred as a result of "rusty water” supplied to her household from August 3, 1984 to August 20, 1984.
At trial, Mrs. Kusnir testified that during this period (and afterward) her family consumed an average of three gallons of bottled water per day at a total cost of $84. She was forced to replace her rust-laden dishwater at a cost of $339.91. A marbelized sink/vanity and two one-piece toilets were severely discolored by rust. The replacement cost of these items is approximately $855. A rust-stained blouse and white technician’s outfit and several photographs were admitted into evidence to demonstrate the effect upon clothing and linen of the rust. Bills and the receipts totaling $168.74 were submitted for the replacement cost of pants, shirts, towels, sheets and blankets.
Mrs. Kusnir testified that she tried to remove the rust stains from her clothes by redoing them several times but that the stains would not come out. She used muriatic acid on the washing machine in an attempt to remove the rust but that didn’t work either. She had no choice but to do her wash and use the sinks and toilets every day. Every time water was run in the house the rust problem compounded and got worse.
*27 Although in the notice of claim Mrs. Kusnir filed for damages against the city in the amount of $2,269, her request in the instant case is limited to $1,500, the jurisdictional limit of the court in small claims.
Mrs. Kusnir testified that she followed up the August 1984 complaints with further calls to the City of Yonkers and to her Councilman but that the problem persists even in September 1985. She submitted into evidence at trial a vial of water taken from the tap in August 1985 and the court observes that the water when shaken becomes permeated with rusty sediment. When asked by the court how the amount of rust in the August 1985 water compared with the August 1984 water, Mrs. Kusnir testified that the rust condition was worse in 1984.
In defending against Mrs. Kusnir’s case, the City of Yonkers called upon Mary Ann Vogel, the Chief Chemist for the city, to show that the city was aware of the rust problem and was doing everything possible to minimize its effect upon the citizens in general, and the plaintiff, in particular.
Mrs. Vogel testified that rusty water has been an ongoing problem in the northwest section of the City of Yonkers. The pipes in this area are old, and oxidation is caused either by disruptions in the flow of water and/or by a high chlorine count.
Chlorine is added by the city to purify and sanitize water. The State of New York has mandated that the level of chlorine in the water be raised in order to prevent bacteria forming at far reaches of the system.
Lewis Avenue, where the plaintiff resides is a dead-end street and has a dead-end main. Water does not flow freely through the pipes on a 24-hour basis (as in most through streets) and the highly chloridated water sits in the pipes until someone uses it. The result is that oxidation has time to occur, rust is formed, and the water becomes rusty.
The City of Yonkers receives numerous complaints from residents in the northwest section and is aware of the rusty water problem.
The problem could be corrected by the city in 1 of 3 ways: by replacing the water main; by clearing the main and adding cement lines; or by looping a dead-end main to connect it with a through line. All of these methods are "expensive” and funding consistently has not been approved for these capital projects by the City Council. An individual homeowner could *28 install an in-line filter, however, the cost of replacement on a weekly or monthly basis (depending on the severity of the rust) amounts to approximately $80 per filter.
The City of Yonkers responds to complaints of citizens about water problems. The city dealt with rusty water problems by flushing hydrants in the neighborhoods of the affected houses. The city responds to particular complaints and when notified sends out a team to flush hydrants. In this case, the City Consumer Complaint Log shows that the city flushed the hydrants in Mrs. Kusnir’s neighborhood numerous times during the period in question and that the city thus probably responded every time they were called by Mrs. Kusnir.
The city’s Chief Chemist acknowledged on cross-examination that there was a high degree of rust in Mrs. Kusnir’s water during August 1984.
The issues in this case, of course, are whether the City of Yonkers is liable for the extreme water damage caused by its supplying of rusty water to the plaintiff’s household and, if so, to what extent.
While a water supply corporation is not an insurer of the purity of the water furnished by it for public consumption, or of its freedom from infection, or liable as guarantor of the purity or quality thereof, it is bound to use reasonable care and diligence in providing pure and wholesome water and in keeping its water supply system free from infection or contamination rendering the water unsafe and dangerous to individuals, or unsuitable for domestic purposes; if it fails to do so, it is liable for injuries resulting therefrom (63 [rev vol] NY Jur, Waterworks, § 94, at 597; Canavan v City of Mechanicville, 229 NY 473 [1920]; 78 Am Jur 2d, Waterworks and Water Companies, § 41, at 931-932). While a municipal corporation voluntarily engaging in operating a waterworks system is subject to the same duties to furnish pure and wholesome water and the same liabilities for injury and death resulting from the furnishing of impure water to consumers as a private corporation, it is not an insurer, nor liable as guarantor, of the quality of the water that it furnishes and cannot be held liable for injuries caused by impure water furnished by it unless it knew or ought to have known of the impurity (63 [rev vol] NY Jur, op. cit. §95; Wiesner v City of Albany, 224 App Div 239 [1928], affd 250 NY 551; 224 App Div 774, affd 250 NY 551; Canavan v City of Mechanicville, supra; Stubbs v City of Rochester, 226 NY 516 [1919]; Oakes Mfg. Co. v City of New *29 York, 206 NY 221 [1912], rearg denied 206 NY 749; Danaher v City of Brooklyn, 119 NY 241 [1890]; see, 78 Am Jur 2d, op. cit. § 43, at 933; see generally, Liability for Furnishing Impure Water, Ann., 54 ALR3d 936, § 2, at 938-940).
While the "artificial” distinctions between the theories of governmental versus proprietary responsibility created in the earlier decisions may have become blurred (see, County of Nassau v South Farmingdale Water Dist., 62 AD2d 380 [1978]), basic tort liability of a municipality for the furnishing of impure water as enumerated above continues as the rule of law in the State of New York. The standard is the exercise of ordinary care applied to the circumstances (see, 54 ALR3d, op. cit. at 939). The ultimate criteria for the trier of facts to determine is what is most equitable when applying the facts and circumstances of each individual case to the principles of law as set forth above (see, County of Nassau v South Farmingdale Water Dist., supra, at pp 392-393).
Based upon a consideration of all of the above the court feels that the City of Yonkers should be liable to Mrs. Kusnir for the damages caused to her family by the supplying of rust-laden water to her household.
The fact is that Mrs. Kusnir was the victim of circumstances over which she had absolutely no control. She lived on a dead-end street and the water system installed by the city failed to allow the free flow of water through the pipes. The result of this design was the stagnation of water in the pipes at Lewis Avenue.
The pipes in the northwest part of the city were admittedly old and basic chemistry tells one that if chloridation is increased, oxidation (and rust) will occur in stagnated water. The city was aware of rusty water problems in the northwest section, and should have (and probably did) anticipate that the increase of chlorine in the water would result in an increase of rust.
Moreover, the city knew that the water problems encountered on dead-end streets could be corrected by any of the three means outlined above but failed to approve these capital projects because of the expense involved.
That left Mrs. Kusnir with a very big water problem over which she had no control. As a citizen and taxpayer she and her family had the right to have water supplied to her household which was ordinarily pure and wholesome. She had the right to expect water to flow from her faucet which was *30 reasonably clean and free from dirt, discoloration and rust contamination (63 [rev vol] NY Jur, op. cit. § 96, at 598).
The city’s answer was to send teams out to flush the hydrants in the neighborhood. This was only a partial (and imperfect) solution to the problem. The fact is that extreme damage was caused to Mrs. Kusnir’s household despite the flushings. This procedure only temporarily alleviated the problem and apparently was unavailable on weekends. While the city did make a good-faith effort to mitigate the effects of the rusty water problem on its citizens by flushing the hydrants, in the opinion of the court it cannot escape liability in this case.
In the matter of damages, the court makes the following findings:
The city is not liable for the replacement of the plaintiff’s dishwasher. The appliance was at least five years old and there was no proof submitted at trial that its demise was caused by rust.
The plaintiff’s request for the cost of bottled water ($84) and replacement of clothing ($168.74) will be allowed. It has been established by a fair preponderance of the credible evidence that the clothing and bedding was irreparably damaged. She has also established by paid bills specific damages in the amount of $168.74.
As to the claim for replacement of fixtures, while plaintiff has established value of approximately $855 she has failed to meet her burden of establishing that replacement is necessary. Her testimony as to the insufficiency of her efforts to clean the fixtures does not rise to the level of expert testimony to the effect that the stains could not be removed and that the fixtures would have to be replaced.
Judgment for the plaintiff in the amount of $252.74 plus costs of $4.67 for a total of $257.41.